UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 99-6153 CR-RYSKAMP(s)(s)(s)(s)

IN THE MATTER OF THE
EXTRADITION OF RAMIRO
VANOY-RAMIREZ
_____/

WEST PALM BEACH,
PALM BEACH COUNTY, FLORIDA
UNITED STATES OF AMERICA

THERESA M.B. VAN VLIET, being duly sworn, deposes and says that:

1.      I am a citizen of the United States of America and a resident of the city of Fort

Lauderdale, Broward County, Florida.

2.      I am 43 years of age. In February, 1983, I received a degree of Juris Doctor,

Magna Cum Laude, from Nova University and was admitted the same year to the bar of the

Supreme Court of the State of Florida.  I served as Law Clerk to the Honorable James C. Paine,

United States District Judge for the Southern District of Florida from September, 1983 through

August, 1985.

3.      From August 20, 1985 through May 9, 1994, I was an Assistant United States

Attorney in the Southern District of Florida.  From May 9, 1994, through October 31, 1998, I

was the Chief of the Narcotic and Dangerous Drug Section, Criminal Division, United States

Department of Justice, Washington, D.C.  Since my departure from the Criminal Division of the

United States Department of Justice, I have been a Senior Litigation Counsel for the United

States Attorney's Office for the Southern District of Florida.  As a result of my various

experiences as a federal prosecutor, my duties included the investigation and prosecution of persons charged with violations of United States laws. I have participated in the investigation, preparation and trial of numerous cases involving alleged violations of United States laws, including those involving violations of United States racketeering laws, violations of United States narcotics laws, narcotics money laundering laws, and related charges. I have served as an instructor at the United States Department of Justice, Drug Enforcement Administration, and Federal Bureau of Investigation and the United States Customs Service and Internal Revenue Service on the subjects of the investigation and prosecution of complex criminal organizations pursuant to these United States laws. Based upon the above referenced training and experience, I am an expert in the criminal laws and procedures of the United States of America.

4.      As noted above, I am currently a Senior Litigation Counsel in the United States Attorney's Office for the Southern District of Florida and am one of the prosecutors in the case of *United States vs. Alejandro Bernal Madrigal, et al.*, Case No. 99-6153 CR-RYSKAMP (s)(s)(s)(s). I am therefore familiar with the charges and evidence in the case of *United States vs. Alejandro Bernal Madrigal, et al.*, and am familiar with the contents of the files pertaining to that case in the United States District Court for the Southern District of Florida and the United States Attorney's Office.

5.      Under the laws of the United States, a criminal prosecution may be commenced by a grand jury on its own decision to return and file an indictment with the Clerk of the United States District Court. A grand jury is composed of not less than sixteen (16) people whom the United States District Court selects at random from the residents of the Southern District of Florida. The grand jury is part of the judicial branch of the Government. The purpose of the

2

grand jury is to view the evidence of crimes presented to it by the United States law enforcement authorities. After independently viewing this evidence, each member of the grand jury must determine if the evidence is sufficient to establish probable cause to believe that a crime has been committed and that the particular defendant or defendants committed the crime. After at least twelve (12) jurors affirmatively vote that there is sufficient evidence against a defendant, the grand jury may return an indictment against that defendant. An indictment is a formal document that charges the defendant with a crime or crimes, describes the specific laws which the defendant is accused of violating and describes the acts of the defendant that are alleged to be violations of the law. After the grand jury returns the indictment, a warrant for the arrest of the defendant named therein is issued at the discretion of a United States District Court Judge or Magistrate Judge. If further evidence is later presented to the grand jury as to the matters for which an indictment is already returned, the grand jury may return a superseding indictment in the same case in the same fashion as with an initial indictment. In such a case, the superseding indictment takes the place of the previously issued indictment. If still further evidence is presented to the grand jury after the return of the superseding indictment, the grand jury may return a second, then third, superseding indictment, each of which takes the place of the previously issued indictment. Although a warrant for the arrest of the defendant or defendants may issue from a superseding indictment in the same fashion as with an original indictment, it is not necessary that a new warrant be issued each time an indictment is replaced with a superseding indictment. For example, an arrest warrant issued on the basis of a second superseding indictment may remain valid after the issuance of a fourth superseding indictment in the same case.

3

6.    On September 30, 1999, a Federal Grand Jury sitting in Fort Lauderdale, Broward County, Florida, returned a second superseding indictment in Case Number 99-6153 CR-RYSKAMP(s)(s) charging RAMIRO VANOY-RAMIREZ and other defendants with a number of violations of criminal law. This second superseding indictment was the basis for the requests for the provisional arrest of RAMIRO VANOY-RAMIREZ, and other co-defendants, which were submitted to the Republic of Colombia and provided the basis for the requested arrest and detention. On September 30, 1999, the Honorable Barry S. Seltzer, United States Magistrate Judge, United States District Court for the Southern District of Florida issued a warrant for the arrest of RAMIRO VANOY-RAMIREZ on the charges set forth in the second superseding indictment.

7.    It is the practice of the United States District Courts for the Southern District of Florida to retain originals of all documents filed with the Court in the custody of the Clerk of the Court. Therefore, I have obtained certified copies of the second superseding indictment and the arrest warrant relating to RAMIRO VANOY-RAMIREZ. These certified copies are attached to this affidavit as Exhibit A, and are incorporated by reference herein.

8.    On November 4, 1999, RAMIRO VANOY-RAMIREZ was formally charged in a third superseding indictment, Case Number 99-6153 CR-RYSKAMP(s)(s)(s), returned by the same Federal Grand Jury sitting in Fort Lauderdale, Broward County, in the Southern District of Florida. A superseding indictment replaces all previous indictments. The charges against RAMIRO VANOY-RAMIREZ and the other defendants remain the same from the second to the third and fourth superseding indictments, but the third superseding indictment includes additional overt acts that the defendants are accused of committing. On November 18, 1999, a fourth

4

superseding indictment was returned by the same Federal Grand Jury. The fourth superseding indictment corrected a typographical error contained in the third superseding indictment relating to the date on which the crimes charged in the indictment concluded. The fourth superseding indictment against RAMIRO VANOY-RAMIREZ charges that:

a.      from December 17, 1997, continu∙ ∙ through on or about November 4, 1999, RAMIRO VANOY-RAMIREZ did knowingly and intentionally combine, conspire, confederate and agree with others known and unknown to possess with intent to distribute five (5) kilograms of more of a quantity of a mixture and substance containing a detectable amount of cocaine, all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, (Count II);

b.      from December 17, 1997, continuing through on or about November 4, 1999, RAMIRO VANOY-RAMIREZ did knowingly and intentionally combine, conspire, confederate and agree with others known and unknown to import into the United States from a place outside thereof a five (5) kilograms or more of a quantity of a mixture and substance containing a detectable amount of cocaine, all in violation of Title 21, United States Code, Sections 952 and 963, (Count III);

c.      from December 17, 1997, continuing through on or about November 4, 1999, RAMIRO VANOY-RAMIREZ did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to

    i)      knowingly and willfully conduct financial transactions affecting interstate and foreign commerce which involved the proceeds of a specified unlawful activity, that is, the receiving, concealment, buying, selling and otherwise dealing in

5

narcotic and dangerous drugs punishable under the laws of the United States,
intending to promote the carrying on of said specified unlawful activity and, to
conduct such financial transactions, knowing that the property involved in the
financial transactions, that is, the funds and monetary instruments, represented the
proceeds of some form of unlawful activity, in violation of Title 18, United States
Code, Section 1956(a)(1)(A)(i),

ii)       knowingly and willfully conduct financial transactions affecting interstate
and foreign commerce which involved the proceeds of a specified unlawful
activity, that is, the receiving, concealment, buying, selling and otherwise dealing in
narcotic and dangerous drugs punishable under the laws of the United States,
knowing that the transactions were designed in whole and in part to conceal the
nature, location, source, ownership and control of the proceeds of said specified
unlawful activity, and to conduct such financial transactions knowing that the
property involved in the financial transactions, that is, funds and monetary
instruments, represented the proceeds of some form of unlawful activity, in
violation of Title 18, United States Code, Section 1956(a)(1)(B)(i),

iii)      within the United States, knowingly to engage and attempt to engage in a
monetary transaction in criminally derived property that (1) is of a value greater
than $10,000 in United States Currency and (2) is derived from specified unlawful
activity, as that term is defined in Title 18, United States Code, Section 1956
(a)(7)(B)(i) and (C), in violation of Title 18, United States Code, Section 1957(a).

All in violation of Title 18, United States Code, Section 1956(h), (Count IV).

9.     As with the second superseding indictment and arrest warrant, I have obtained

from the Clerk of the Court certified copies of the third and fourth superseding indictments

described above.  These certified copies are attached to this affidavit as Exhibit B, and are

incorporated by reference herein.  The arrest warrant issued pursuant to the second superseding

indictment remains valid and in force against RAMIRO VANOY-RAMIREZ.

10.     I have also attached, as Exhibit C, a true and accurate copy of the text of all of the

statutes, with penalties, cited in the fourth superseding indictment, including those relevant to the

charges in which RAMIRO VANOY-RAMIREZ is named as a defendant.  I have thoroughly

reviewed the statutes cited and attest that they were duly enacted and in force at the time the

offenses occurred, at the time the indictment was filed, and are currently in force.  I further attest

that the substance cocaine is a narcotic controlled substance under United States law.  Violations

of these laws are felonies under the laws of the United States.

11.     All of the actions taken by RAMIRO VANOY-RAMIREZ in this case took place

subsequent to December 17, 1997.

12.     I have also attached, as Exhibit D, a true and accurate copy of the text of Title 18,

United States Code, Section 3282, which is the statute of limitations on prosecuting the crimes

charged in the indictments referenced above.  The statute of limitations merely requires that a

defendant be formally charged within five years of the date that the offense or offenses were

committed.  Once an indictment has been filed in the United States District Court, as with these

charges against RAMIRO VANOY-RAMIREZ, the statute of limitations is tolled and no longer

runs.  I have thoroughly reviewed the applicable statute of limitations, and the prosecution of the

charges in this case is not barred by the statute of limitations.  Since the applicable statute of

7

limitations is five years, and the fourth superseding indictment, which charges criminal violations occurring after December 17, 1997 and continuing up to November 4, 1999, was filed on November 18, 1999, RAMIRO VANOY-RAMIREZ was formally charged within the prescribed five year time period, and his prosecution in this case is not barred by the statute of limitations.

13.      I have also attached, as Exhibit E, a true and accurate copy of the affidavit of Special Agent Paul Craine, United States Department of Justice, Drug Enforcement Administration. Special Agent Craine's affidavit was sworn to before the Honorable Ann E. Vitunac, United States Magistrate Judge for the Southern District of Florida, who is legally authorized to administer an oath for this purpose. I have thoroughly reviewed Special Agent Craine's affidavit and the attachments thereto, and attest that this evidence indicates that RAMIRO VANOY-RAMIREZ is guilty of the offenses charged in the indictments referenced above.

Further Affiant sayeth naught.

THERESA M.B. VAN VLIET
Senior Litigation Counsel
United States Attorney's Office
Southern District of Florida

Sworn and subscribed to before me
this  18th  day of November, 1999, at
West Palm Beach, Palm Beach County, in
the Southern District of Florida.

ANN E. VITUNAC
United States Magistrate Judge

# EXHIBIT A

AO 442 (Rev. 12/85) Warrant for Arrest        AUSA THERESA VAN VLIET        SA KEVIN BYRNES(DEA)

# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

RAMIRO VANOY-RAMIREZ
a/k/a Cuco, a/k/a Marcos

**WARRANT FOR ARREST**

CASE NUMBER:    99-6153-CR-RYSKAMP(s)(s)

FILED
MAGISTRATE SECTION
SEP 30 1999

To: The United States Marshal
    and any Authorised United States Officer

YOU ARE HEREBY COMMANDED to arrest    RAMIRO VANOY-RAMIREZ, a/k/a Cuco, a/k/a Marcos
                                                                           Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

[x] Indictment          [ ] Information          [ ] Complaint

[ ] Order of Court      [ ] Violation Notice     [ ] Probation Violation Petition

charging him or her with (brief description of offense)

conspiracy to distribute and import cocaine, and money laundering

in violation of Title   21;18   United States Code, Sections(s)   846, 963; 1956

CLARENCE MADDOX                          Clerk of Court/Court Administrator
Name of Issuing officer                  Title of Issuing Officer

_[signature]_                            September 30, 1999, Fort Lauderdale, Florida
Signature of Issuing Officer             Date and Location

Bail fixed at $ Pretrial Detention    by UNITED STATES MAGISTRATE JUDGE
                                           BARRY S. SELTZER
                                           Name of Judicial officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

INFORMATION COPY ONLY
MAKE RETURN ON
ORIGINAL WARRANT WITH
UNITED STATES MARSHAL

Certified to be a true and
correct copy of the original.
Carlos Juenke, Clerk
Southern District of Florida
By _____
Deputy Clerk
Date   10-7-99

AO 442 (Rev. 12/85) Warrant for Arrest

AO 442 (Rev. 12/85) Warrant for Arrest      AUSA THERESA VAN VLIET      SA KEVIN BYRNES (DEA)

# United States District Court

<u>SOUTHERN</u>    DISTRICT OF _____ <u>FLORIDA</u>

UNITED STATES OF AMERICA

V.

RAMIRO VANOY-RAMIREZ
a/k/a Cuco, a/k/a Marcos

### WARRANT FOR ARREST

CASE NUMBER:   99-6153-CR-RYSKAMP(s)(s)

FILED
MAGISTRATE SECTION

SEP 30 1999

To: The United States Marshal
    and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest   <u>RAMIRO VANOY-RAMIREZ, a/k/a Cuco, a/k/a Marcos</u>

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

[x] Indictment      [ ] Information      [ ] Complaint

[ ] Order of Court      [ ] Violation Notice      [ ] Probation Violation Petition

charging him or her with (brief description of offense)

conspiracy to distribute and import cocaine, and money laundering

in violation of Title  <u>21;18</u>  United States Code, Sections(s)  <u>846, 963; 1956</u>

<u>CLARENCE MADDOX</u>
Name of Issuing officer

Signature of Issuing Officer

Bail fixed at $ <u>Pretrial Detention</u>

<u>Clerk of Court/Court Administrator</u>
Title of Issuing Officer

<u>September 30, 1999</u>, Fort Lauderdale, Florida
Date and Location

BARRY S. SELTZER
by <u>UNITED STATES MAGISTRATE JUDGE</u>
Name of Judicial officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at |

DATE RECEIVED      NAME AND TITLE OF ARRESTING OFFICER      SIGNATURE OF ARRESTING OFFICER

DATE OF ARREST

INFORMATION COPY ONLY
MAKE RETURN ON
ORIGINAL WARRANT WITH
UNITED STATES MARSHAL

Certified to be a true and correct copy of the original
Carlos Juenke, Clerk
U. S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 10-1-99

AO 442 (Rev. 12/85) Warrant for Arrest

TVV

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

CASE NO.  99-6153 CR-RYSKAMP (s)(s)

21 U.S.C. §848(a) and (b)
21 U.S.C. §846
21 U.S.C. §963
18 U.S.C. §1956(h)



UNITED STATES OF AMERICA,

vs.

1) ALEJANDRO BERNAL-MADRIGAL, )
    a/k/a "Juvenal," )
    a/k/a "Tony," )
2) ARMANDO VALENCIA, )
    a/k/a "Juanito," )
    a/k/a "Luis Valencia-Valencia," )
3) FABIO OCHOA-VASQUEZ, )
    a/k/a "Julio," )
    a/k/a "Pepe," )
4) ALBERTO GALLEGO, )
    a/k/a "El Doctor," )
5) MARTHA NUBIA RESTREPO ISAZA, )
    a/k/a "Lucia," )
6) GUILLERMO MORENO-RIOS, )
    a/k/a "Memo," )
    a/k/a "El Pelon," )
7) JARIO de JESUS MESA-SANIN, )
    a/k/a "Paco," )
    a/k/a "Cristian," )
    a/k/a "Cunado," )
8) ORLANDO SANCHEZ-CRISTANCHO, )
    a/k/a "Martin," )
    a/k/a "Orlan," )
    a/k/a "Tono," )
9) JAIME GONZALO CASTIBLANCO- )
    CABALCANTE, )
    a/k/a "Chalito," )


Certified to be a true and correct copy of the document on file
Clarence Maddox, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date  11-10-99

1

a/k/a"Sergio,"                              )
10) RAMIRO VANOY-RAMIREZ,                   )
    a/k/a "Cuco,"                            )
    a/k/a "Marcos,"                          )
11) NELSON ALBERTO GIRALDO-PALACIO,         )
    a/k/a "Palustre,"                        )
    a/k/a "Albanil,"                         )
    a/k/a "Inginero Luis Salgado,"
12)JAIRO SANCHEZ-CRISTANCHO,                )
    a/k/a "Jota,"                            )
13)HERNAN ABELARDO GOMEZ-MORENO,            )
14)LUIS FERNANDO REBELLON-ARCILA,           )
    a/k/a "Jimmy,"                           )
15)CARLOS JARAMILLO,                        )
16)HERMIS DE JESUS BETANCOURT-RIOS,         )
    a/k/a "Saulo,"                           )
17)JORGE MAURICIO SANCHEZ-VIDAL,            )
    a/k/a "Mao,"                             )
18)JOSE WALTER SEPULVEDA-RIOS,              )
    a/k/a "El Apa,"                          )
19)ADRIANA MARCELA VACCA-BOJACA,            )
20)CARLOS SANCHEZ,                          )
21)MAURICIO MEJIA TORO                      )
    a/k/a "Suchi,"                           )
    a/k/a "Motorola,"                        )
22)FREDDY IVAN OCHOA-MEJIA,                 )
    a/k/a "Andres,"                          )
23)ALFREDO TASCON,                          )
    a/k/a "Alfredito,"                       )
24)JAVIER LINDO,                            )
    a/k/a "El Gordo,"                        )
25)DARIO ECHEVERRY,                         )
26)EVER VILLAFANE-MARTINEZ,                 )
    a/k/a "Juancho,"                         )
27)MARIO ASTAIZA,                           )
    a/k/a "Marciano,"                        )
28)CARLOS CARDENAS,                         )
    a/k/a "Caliche,"                         )
29)BERNARDO ALBERTO SANCHEZ-NORENA,)
    a/k/a "Don Bernardo,"                    )
30)HECTOR MARIO LONDONO-VASQUEZ,            )
    a/k/a "El Negro,"                        )
31)OSCAR ARTURO CAMPUZANO-ZAPATA,           )

2

```
        a/k/a "El Flaco,"                        )
32)RICARDO PASTOR OCHOA-RUIZ,                    )
        a/k/a "Camilo,"                          )
33)EDWIN GONZALEZ-ARBELAEZ,                      )
34)SANTIAGO VELEZ VELAZQUEZ,                     )
        a/k/a "Negro Velez,"                     )
35)MARIO GERMAN LOPEZ CARDONA,                   )
        a/k/a "Pedro,"                           )
36)SERGIO PERDOMO LIEVANO,                       )
37)JUAN GABRIEL USUGA NORENA,                    )
        a/k/a "Bionico,"                         )
38)HORACIO DE JESUS MORENO URIBE,                )
39)CARLOS BARRERA,                               )
        a/k/a "Caliche,"                         )
40)CARLOS MARIO LOPEZ MOLINA,                    )
41)OSCAR ALONSO GOMEZ MORENO,                    )
42)FERNANDO ANTONIO ESQUIVIA SOTELO,  )
        a/k/a "Nando," "Cirilo," and             )
43)LUIS CARLOS ZULUAGA QUICENO,                  )
                    Defendants.                  )
_____/
```

3

## INDICTMENT

The Grand Jury charges that:

### COUNT I

From on or about December 17, 1997, through on or about September 30, 1999, at Broward and Miami Dade Counties, in the Southern District of Florida, the Republic of Colombia, the Republic of Mexico, the Bahamas, and elsewhere, the defendant,

### ALEJANDRO BERNAL-MADRIGAL
a/k/a "Juvenal"
a/k/a "Tony,"

did knowingly and intentionally engage in a continuing criminal enterprise, as that term is defined in Title 21, United States Code, Section 848(c). That is, the defendant knowingly and intentionally committed a felony violation of Title 21, United States Code; that such violation is part of a continuing series of violations of Title 21, United States Code, undertaken by defendant in concert with five or more persons with respect to whom the defendant occupies a position of principal administrator, organizer, and leader of the continuing criminal enterprise; and from which activity defendant obtains substantial income and resources.

It is further alleged that the violations committed as part of the continuing criminal enterprise involved 150 kilograms or more of a quantity of a mixture and substance containing a detectable amount of cocaine;

It is further alleged that the continuing criminal enterprise received in excess of ten million dollars ($10,000,000.00) in gross receipts during any twelve (12) month period of its existence after December 17, 1997, for the manufacture, importation, and distribution of a mixture and substance containing a detectable amount of cocaine.

4

All in violation of Title 21, United States Code, Section 848 (a),(b) and (c).

## COUNT II

From on or about December 17, 1997, through on or about September 30, 1999 at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
FABIO OCHOA-VASQUEZ,
a/k/a "Julio,"
a/k/a "Pepe,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a"Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
NELSON ALBERTO GIRALDO-PALACIO,
a/k/a "Palustre,"
a/k/a "Albanil,"
a/k/a "Inginero Luis Salgado,"

5

JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
MAURICIO MEJIA TORO
a/k/a "Suchi,"
a/k/a "Motorola,"
FREDDY IVAN OCHOA-MEJIA,
a/k/a "Andres,"
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
DARIO ECHEVERRY,
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
EDWIN GONZALEZ-ARBELAEZ,
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"

6

SERGIO PERDOMO LIEVANO,
CARLOS MARIO LOPEZ MOLINA,
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando " "Cirilo,"and
LUIS CARLOS ZULUAGA QUICENO,

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to distribute, and to possess with the intent

to distribute, five (5) kilograms or more of a mixture and substance containing a detectable

amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United

States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## COUNT III

From on or about December 17, 1997, through on or about September 30, 1999 at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
FABIO OCHOA-VASQUEZ,
a/k/a "Julio,"
a/k/a "Pepe,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"

7

a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a "Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
NELSON ALBERTO GIRALDO-PALACIO,
a/k/a "Palustre,"
a/k/a "Albanil,"
a/k/a "Inginero Luis Salgado,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
MAURICIO MEJIA TORO
a/k/a "Suchi,"
a/k/a "Motorola,"
FREDDY IVAN OCHOA-MEJIA,
a/k/a "Andres,"
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
DARIO ECHEVERRY,
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"

8

MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
EDWIN GONZALEZ-ARBELAEZ,
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
CARLOS MARIO LOPEZ MOLINA,
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo,"and
LUIS CARLOS ZULUAGA QUICENO,

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to import into the United States from a

place outside thereof, a quantity of five (5) kilograms or more of a mixture and substance

containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in

violation of Title 21, United States Code, Section 952.

All in violation of Title 21, United States Code, Section 963.

## COUNT IV

From on or about December 17, 1997, through on or about September 30, 1999 at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

9

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
MARTHA NUBIA RESTREPO ISAZA,
a/k/a "Lucia,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a "Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
ALFREDO TASCON,

10

a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
JUAN GABRIEL USUGA NORENA,
a/k/a "Bionico,"
HORACIO DE JESUS MORENO URIBE,
CARLOS BARRERA,
a/k/a "Caliche,"
CARLOS MARIO LOPEZ MOLINA,
OSCAR ALONSO GOMEZ MORENO,
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo," and
LUIS CARLOS ZULUAGA QUICENO,

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to commit the following offenses against the

United States:

1. to conduct and attempt to conduct financial transactions, affecting interstate and

foreign commerce, which involved the proceeds of specified unlawful activity, as that term is

11

defined in Title 18, United States Code, Section1956 (a)(7)(B)(i) and (C), and that the defendant

knew that the property involved in the financial transactions, that is, funds and monetary

instruments, including United States Currency, represented the proceeds of some form of

unlawful activity, with the intent to promote the carr  .g on of the specified unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1)(A)(i),

2.  to conduct and attempt to conduct financial transactions, affecting interstate and

foreign commerce, which involved the proceeds of specified unlawful activity, as that term is

defined in Title 18, United States Code, Section1956 (a) (7)(B)(i) and (C), knowing both that the

transactions were designed in whole or in part to conceal and disguise the nature, location,

source, ownership and control of the proceeds of the specified unlawful activity, and that the

defendant knew the property involved in the financial transactions, that is, funds and monetary

instruments, including United States Currency, represented the proceeds of some form of

unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and

3.  within the United States, knowingly to engage and attempt to engage in a monetary

transaction in criminally derived property that (1) is of a value greater than $10,000 in United

12

States Currency and (2) is derived from specified unlawful activity, as that term is defined in Title

18, U.S.C. Section 1956(a) (7)(B)(i) and (C), in violation of Title 18, United States Code, Section

1957(a).

All in violation of Title 18, United States Code, Section 1956(h).

A TRUE BILL

_____
FOREPERSON

_____
THOMAS E. SCOTT
UNITED STATES ATTORNEY

_____
THERESA M. B. VAN VLIET
ASSISTANT UNITED STATES ATTORNEY

_____
GLENN C. ALEXANDER
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE

13

# EXHIBIT B

TVV/cds

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

CASE NO. <u>99-6153 CR-RYSKAMP (s)(s)(s)</u>
21 U.S.C. §848(a) and (b)
21 U.S.C. §846
21 U.S.C. §963
18 U.S.C. §1956(h)

RECEIVED & FILED IN OPEN COURT
ON ___11-4-99___ AT
___HC___, FLA.
Carlos Juenke, Clerk
United States District Court
Southern District of Florida

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) |
| | ) |
| 1) ALEJANDRO BERNAL-MADRIGAL, | ) |
| a/k/a "Juvenal," | ) |
| a/k/a "Tony," | ) |
| 2) ARMANDO VALENCIA, | ) |
| a/k/a "Juanito," | ) |
| a/k/a "Luis Valencia-Valencia," | ) |
| 3) FABIO OCHOA-VASQUEZ, | ) |
| a/k/a "Julio," | ) |
| a/k/a "Pepe," | ) |
| 4) ALBERTO GALLEGO, | ) |
| a/k/a "El Doctor," | ) |
| 5) MARTHA NUBIA RESTREPO ISAZA, | ) |
| a/k/a "Lucia," | ) |
| 6) GUILLERMO MORENO-RIOS, | ) |
| a/k/a "Memo," | ) |
| a/k/a "El Pelon," | ) |
| 7) JARIO de JESUS MESA-SANIN, | ) |
| a/k/a "Paco," | ) |
| a/k/a "Cristian," | ) |
| a/k/a "Cunado," | ) |
| 8) ORLANDO SANCHEZ-CRISTANCHO, | ) |
| a/k/a "Martin," | ) |
| a/k/a "Orlan," | ) |
| a/k/a "Tono," | ) |
| 9) JAIME GONZALO CASTIBLANCO- | ) |
| CABALCANTE, | ) |
| a/k/a "Chalito," | ) |

Certified to be a true and
correct copy of the document on file
Clarence Maddox, Clerk,
U. S. District Court
Southern District of Florida
by X _____
Date ___11-10-99___    Deputy Clerk

1



```
             a/k/a"Sergio,"                         )
10) RAMIRO VANOY-RAMIREZ,                            )
             a/k/a "Cuco,"                           )
             a/k/a "Marcos,"                         )
11) NELSON ALBERTO GIRALDO-PALACIO,                  )
             a/k/a "Palustre,"                       )
             a/k/a "Albanil,"                        )
             a/k/a "Inginero Luis Salgado,"          )
12)JAIRO SANCHEZ-CRISTANCHO,                         )
             a/k/a "Jota,"                           )
13)HERNAN ABELARDO GOMEZ-MORENO,                     )
14)LUIS FERNANDO REBELLON-ARCILA,                    )
             a/k/a "Jimmy,"                          )
15)CARLOS JARAMILLO,                                 )
16)HERMIS DE JESUS BETANCOURT-RIOS,                  )
             a/k/a "Saulo,"                          )
17)JORGE MAURICIO SANCHEZ-VIDAL,                     )
             a/k/a "Mao,"                            )
18)JOSE WALTER SEPULVEDA-RIOS,                       )
             a/k/a "El Apa,"                         )
19)ADRIANA MARCELA VACCA-BOJACA,                     )
20)CARLOS SANCHEZ,                                   )
21)MAURICIO MEJIA TORO                               )
             a/k/a "Suchi,"                          )
             a/k/a "Motorola,"                       )
22)FREDDY IVAN OCHOA-MEJIA,                          )
             a/k/a "Andres,"                         )
23)ALFREDO TASCON,                                   )
             a/k/a "Alfredito,"                      )
24)JAVIER LINDO,                                     )
             a/k/a "El Gordo,"                       )
25)DARIO ECHEVERRY,                                  )
26)EVER VILLAFANE-MARTINEZ,                          )
             a/k/a "Juancho,"                        )
27)MARIO ASTAIZA,                                    )
             a/k/a "Marciano,"                       )
28)CARLOS CARDENAS,                                  )
             a/k/a "Caliche,"                        )
29)BERNARDO ALBERTO SANCHEZ-NORENA,)
             a/k/a "Don Bernardo,"                   )
30)HECTOR MARIO LONDONO-VASQUEZ,                     )
             a/k/a "El Negro,"                       )
31)OSCAR ARTURO CAMPUZANO-ZAPATA,                    )
```

```
        a/k/a "El Flaco,"                              )
32)RICARDO PASTOR OCHOA-RUIZ,                          )
        a/k/a "Camilo,"                                )
33)EDWIN GONZALEZ-ARBELAEZ,                            )
        a/k/a "Edwin Gonzalez,"                        )
        a/k/a "Juan Guillermo Arbelaez Diaz,"          )
34)SANTIAGO VELEZ VELAZQUEZ,                           )
        a/k/a "Negro Velez,"                           )
35)MARIO GERMAN LOPEZ CARDONA,                         )
        a/k/a "Pedro,"                                 )
36)SERGIO PERDOMO LIEVANO,                             )
37)JUAN GABRIEL USUGA NORENA,                          )
        a/k/a "Bionico,"                               )
38)HORACIO DE JESUS MORENO URIBE,                      )
39)CARLOS BARRERA,                                     )
        a/k/a "Caliche,"                               )
        a/k/a "Carlos David Barrera Garces,"           )
40)CARLOS MARIO LOPEZ MOLINA,                          )
        a/k/a "Carlos Mario Londono Botero,"           )
41)OSCAR ALONSO GOMEZ MORENO,                          )
42)FERNANDO ANTONIO ESQUIVIA SOTELO, )
        a/k/a "Nando," "Cirilo," and                   )
43)LUIS CARLOS ZULUAGA QUICENO,                        )
        a/k/a "Marco Antonio Arboleda Saldarriaga,")
                        Defendants.                     )
_____/
```

3

## INDICTMENT

The Grand Jury charges that:

### COUNT I

From on or about December 17, 1997, through on or about September 30, 1999, at Broward and Miami Dade Counties, in the South n District of Florida, the Republic of Colombia, the Republic of Mexico, the Bahamas, and elsewhere, the defendant,

### ALEJANDRO BERNAL-MADRIGAL
a/k/a "Juvenal"
a/k/a "Tony,"

did knowingly and intentionally engage in a continuing criminal enterprise, as that term is defined in Title 21, United States Code, Section 848(c). That is, the defendant knowingly and intentionally committed a felony violation of Title 21, United States Code; that such violation is part of a continuing series of violations of Title 21, United States Code, undertaken by defendant in concert with five or more persons with respect to whom the defendant occupies a position of principal administrator, organizer, and leader of the continuing criminal enterprise; and from which activity defendant obtains substantial income and resources.

It is further alleged that the violations committed as part of the continuing criminal enterprise involved 150 kilograms or more of a quantity of a mixture and substance containing a detectable amount of cocaine;

It is further alleged that the continuing criminal enterprise received in excess of ten million dollars ($10,000,000.00) in gross receipts during any twelve (12) month period of its existence after December 17, 1997, for the manufacture, importation, and distribution of a mixture and substance containing a detectable amount of cocaine.

4

It is further alleged that the continuing series of violations of Title 21, committed by the defendant included, but were not limited, to the following:

a.) The importation of approximately 8671 kilograms of a mixture and substance containing a detectable amount of cocaine from Colombia, through Mexico and into the United States in or about February through March, 1999.

b.) The attempted importation of approximately 3538 kilograms of a mixture and substance containing a detectable amount of cocaine from Ecuador and into the United States in or about August, 1999.

c.) The importation of approximately 740 kilograms of a mixture and substance containing a detectable amount of cocaine from Columbia and into the United States at the Port of Houston, in the Southern District of Texas, on or about August 30, 1999.

All in violation of Title 21, United States Code, Section 848 (a),(b) and (c).

## COUNT II

From on or about December 17, 1997, through on or about September 30, 1999 at Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
FABIO OCHOA-VASQUEZ,
a/k/a "Julio,"
a/k/a "Pepe,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"

5

GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a "Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
NELSON ALBERTO GIRALDO-PALACIO,
a/k/a "Palustre,"
a/k/a "Albanil,"
a/k/a "Inginero Luis Salgado,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
MAURICIO MEJIA TORO
a/k/a "Suchi,"
a/k/a "Motorola,"
FREDDY IVAN OCHOA-MEJIA,
a/k/a "Andres,"
ALFREDO TASCON,
a/k/a "Alfredito,"

6

JAVIER LINDO,
a/k/a "El Gordo,"
DARIO ECHEVERRY,
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
EDWIN GONZALEZ-ARBELAEZ,
a/k/a "Edwin Gonzalez,"
a/k/a "Juan Guillermo Arbelaez Diaz,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
CARLOS MARIO LOPEZ MOLINA,
a/k/a "Carlos Mario Londono Botero,"
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo," and
LUIS CARLOS ZULUAGA QUICENO,
a/k/a "Marco Antonio Arboleda Saldarriaga,"

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to distribute, and to possess with the intent

to distribute, five (5) kilograms or more of a mixture and substance containing a detectable

amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United

States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

7

## COUNT III

From on or about December 17, 1997, through on or about September 30, 1999 at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
FABIO OCHOA-VASQUEZ,
a/k/a "Julio,"
a/k/a "Pepe,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a"Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
NELSON ALBERTO GIRALDO-PALACIO,
a/k/a "Palustre,"
a/k/a "Albanil,"
a/k/a "Inginero Luis Salgado,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"

8

HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
MAURICIO MEJIA TORO
a/k/a "Suchi,"
a/k/a "Motorola,"
FREDDY IVAN OCHOA-MEJIA,
a/k/a "Andres,"
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
DARIO ECHEVERRY,
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
EDWIN GONZALEZ-ARBELAEZ,
a/k/a "Edwin Gonzalez,"
a/k/a "Juan Guillermo Arbelaez Diaz,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"

9

MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
CARLOS MARIO LOPEZ MOLINA,
a/k/a "Carlos Mario Londono Botero,"
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo,"and
LUIS CARLOS ZULUAGA QUICENO,
a/k/a "Marco Antonio Arboleda Saldarriaga,"

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to import into the United States from a

place outside thereof, a quantity of five (5) kilograms or more of a mixture and substance

containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in

violation of Title 21, United States Code, Section 952.

All in violation of Title 21, United States Code, Section 963.

## COUNT IV

From on or about December 17, 1997, through on or about September 30, 1999 at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
MARTHA NUBIA RESTREPO ISAZA,
a/k/a "Lucia,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"

10

JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a "Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,

11

a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
JUAN GABRIEL USUGA NORENA,
a/k/a "Bionico,"
HORACIO DE JESUS MORENO URIBE,
CARLOS BARRERA,
a/k/a "Caliche,"
a/k/a "Carlos David Barrera Garces,"
CARLOS MARIO LOPEZ MOLINA,
a/k/a "Carlos Mario Londono Botero,"
OSCAR ALONSO GOMEZ MORENO,
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo," and
LUIS CARLOS ZULUAGA QUICENO,
a/k/a "Marco Antonio Arboleda Saldarriaga,"

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to commit the following offenses against the

United States:

1. to conduct and attempt to conduct financial transactions, affecting interstate and

foreign commerce, which involved the proceeds of specified unlawful activity, as that term is

defined in Title 18, United States Code, Section 1956 (a)(7)(B)(i) and (C), and that the defendant

knew that the property involved in the financial transactions, that is, funds and monetary

instruments, including United States Currency, represented the proceeds of some form of

unlawful activity, with the intent to promote the carrying on of the specified unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1)(A)(i),

12

2. to conduct and attempt to conduct financial transactions, affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, as that term is defined in Title 18, United States Code, Section1956 (a) (7)(B)(i) and (C), knowing both that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, and that the defendant knew the property involved in the financial transactions, that is, funds and monetary instruments, including United States Currency, represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and

3. within the United States, knowingly to engage and attempt to engage in a monetary transaction in criminally derived property that (1) is of a value greater than $10,000 in United

13

States Currency and (2) is derived from specified unlawful activity, as that term is defined in Title 18, U.S.C. Section 1956(a) (7)(B)(i) and (C), in violation of Title 18, United States Code, Section 1957(a).

All in violation of Title 18, United States Code, Section 1956(h).

A TRUE BILL

FOREPERSON

THOMAS E. SCOTT
UNITED STATES ATTORNEY

THERESA M. B. VAN VLIET
ASSISTANT UNITED STATES ATTORNEY

GLENN C. ALEXANDER
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE

EDWARD R. RYAN
ASSISTANT UNITED STATES ATTORNEY

14

TVV/cds

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.  99-6153 CR-RYSKAMP (s)(s)(s)(s)
21 U.S.C. §848(a) and (b)
21 U.S.C. §846
21 U.S.C. §963
18 U.S.C. §1956(h)

UNITED STATES OF AMERICA,                    )
                                             )
vs.                                          )
                                             )
1) ALEJANDRO BERNAL-MADRIGAL,                )
        a/k/a "Juvenal,"                     )
        a/k/a "Tony,"                        )
2) ARMANDO VALENCIA,                         )
        a/k/a "Juanito,"                     )
        a/k/a "Luis Valencia-Valencia,"      )
3) FABIO OCHOA-VASQUEZ,                       )
        a/k/a "Julio,"                        )
        a/k/a "Pepe,"                         )
4) ALBERTO GALLEGO,                           )
        a/k/a "El Doctor,"                     )
5) MARTHA NUBIA RESTREPO ISAZA,               )
        a/k/a "Lucia,"                         )
6) GUILLERMO MORENO-RIOS,                     )
        a/k/a "Memo,"                          )
        a/k/a "El Pelon,"                      )
7) JARIO de JESUS MESA-SANIN,                 )
        a/k/a "Paco,"                          )
        a/k/a "Cristian,"                       )
        a/k/a "Cunado,"                         )
8) ORLANDO SANCHEZ-CRISTANCHO,                )
        a/k/a "Martin,"                         )
        a/k/a "Orlan,"                          )
        a/k/a "Tono,"                           )
9) JAIME GONZALO CASTIBLANCO-                  )
        CABALCANTE,                            )
        a/k/a "Chalito,"                        )
        a/k/a "Sergio,"                         )
10) RAMIRO VANOY-RAMIREZ,                     )

a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
JUAN GABRIEL USUGA NORENA,
a/k/a "Bionico,"
HORACIO DE JESUS MORENO URIBE,
CARLOS BARRERA,
a/k/a "Caliche,"
a/k/a "Carlos David Barrera Garces,"
CARLOS MARIO LOPEZ MOLINA,
a/k/a "Carlos Mario Londono Botero,"
OSCAR ALONSO GOMEZ MORENO,

FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo," and
LUIS CARLOS ZULUAGA QUICENO,
a/k/a "Marco Antonio Arboleda Saldarriaga,"

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to commit the following offenses against the

United States:

1. to conduct and attempt to conduct financial transactions, affecting interstate and

foreign commerce, which involved the proceeds of specified unlawful activity, as that term is

defined in Title 18, United States Code, Section1956 (a)(7)(B)(i) and (C), and that the defendant

knew that the property involved in the financial transactions, that is, funds and monetary

instruments, including United States Currency, represented the proceeds of some form of

unlawful activity, with the intent to promote the carrying on of the specified unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1)(A)(i),

2. to conduct and attempt to conduct financial transactions, affecting interstate and

foreign commerce, which involved the proceeds of specified unlawful activity, as that term is

defined in Title 18, United States Code, Section1956 (a) (7)(B)(i) and (C), knowing both that the

transactions were designed in whole or in part to conceal and disguise the nature, location,

source, ownership and control of the proceeds of the specified unlawful activity, and that the

defendant knew the property involved in the financial transactions, that is, funds and monetary

instruments, including United States Currency, represented the proceeds of some form of

unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and

3. within the United States, knowingly to engage and attempt to engage in a monetary

transaction in criminally derived property that (1) is of a value greater than $10,000 in United

```
        a/k/a "Cuco,"                          )
        a/k/a "Marcos,"                        )
11) NELSON ALBERTO GIRALDO-PALACIO,            )
        a/k/a "Palustre,"                      )
        a/k/a "Albanil,"                       )
        a/k/a "Inginero Luis Salgado,"         )
12)JAIRO SANCHEZ-CRISTANCHO,                   )
        a/k/a "Jota,"                          )
13)HERNAN ABELARDO GOMEZ-MORENO,               )
14)LUIS FERNANDO REBELLON-ARCILA,              )
        a/k/a "Jimmy,"                         )
15)CARLOS JARAMILLO,                           )
16)HERMIS DE JESUS BETANCOURT-RIOS,            )
        a/k/a "Saulo,"                         )
17)JORGE MAURICIO SANCHEZ-VIDAL,               )
        a/k/a "Mao,"                           )
18)JOSE WALTER SEPULVEDA-RIOS,                 )
        a/k/a "El Apa,"                        )
19)ADRIANA MARCELA VACCA-BOJACA,               )
20)CARLOS SANCHEZ,                             )
21)MAURICIO MEJIA TORO                         )
        a/k/a "Suchi,"                         )
        a/k/a "Motorola,"                      )
22)FREDDY IVAN OCHOA-MEJIA,                    )
        a/k/a "Andres,"                        )
23)ALFREDO TASCON,                             )
        a/k/a "Alfredito,"                     )
24)JAVIER LINDO,                               )
        a/k/a "El Gordo,"                      )
25)DARIO ECHEVERRY,                            )
26)EVER VILLAFANE-MARTINEZ,                    )
        a/k/a "Juancho,"                       )
27)MARIO ASTAIZA,                             )
        a/k/a "Marciano,"                      )
28)CARLOS CARDENAS,                            )
        a/k/a "Caliche,"                       )
29)BERNARDO ALBERTO SANCHEZ-NORENA,)
        a/k/a "Don Bernardo,"                  )
30)HECTOR MARIO LONDONO-VASQUEZ,               )
        a/k/a "El Negro,"                      )
31)OSCAR ARTURO CAMPUZANO-ZAPATA,              )
        a/k/a "El Flaco,"                      )
32)RICARDO PASTOR OCHOA-RUIZ,                  )
        a/k/a "Camilo,"                        )
33)EDWIN GONZALEZ-ARBELAEZ,                    )
```

```
        a/k/a "Edwin Gonzalez,"                  )
        a/k/a "Juan Guillermo Arbelaez Diaz,"    )
34)SANTIAGO VELEZ VELAZQUEZ,                      )
        a/k/a "Negro Velez,"                      )
35)MARIO GERMAN LOPEZ CARDONA,                    )
        a/k/a "Pedro,"                            )
36)SERGIO PERDOMO LIEVANO,                        )
37)JUAN GABRIEL USUGA NORENA,                     )
        a/k/a "Bionico,"                          )
38)HORACIO DE JESUS MORENO URIBE,                 )
39)CARLOS BARRERA,                                )
        a/k/a "Caliche,"                          )
        a/k/a "Carlos David Barrera Garces,"      )
40)CARLOS MARIO LOPEZ MOLINA,                     )
        a/k/a "Carlos Mario Londono Botero,"      )
41)OSCAR ALONSO GOMEZ MORENO,                     )
42)FERNANDO ANTONIO ESQUIVIA SOTELO, )
        a/k/a "Nando," "Cirilo," and              )
43)LUIS CARLOS ZULUAGA QUICENO,                   )
        a/k/a "Marco Antonio Arboleda Saldarriaga,")
                    Defendants.                    )
_____/
```

## INDICTMENT

The Grand Jury charges that:

### COUNT I

From on or about December 17, 1997, through on or about November 4,1999, at

Broward and Miami Dade Counties, in the Southern District of Florida, the Republic of

Colombia, the Republic of Mexico, the Bahamas, and elsewhere, the defendant,

### ALEJANDRO BERNAL-MADRIGAL
a/k/a "Juvenal"
a/k/a "Tony,"

did knowingly and intentionally engage in a continuing criminal enterprise, as that term is defined

in Title 21, United States Code, Section 848(c). That is, the defendant knowingly and

intentionally committed a felony violation of Title 21, United States Code; that such violation is

part of a continuing series of violations of Title 21, United States Code, undertaken by defendant

in concert with five or more persons with respect to whom the defendant occupies a position of

principal administrator, organizer, and leader of the continuing criminal enterprise; and from

which activity defendant obtains substantial income and resources.

It is further alleged that the violations committed as part of the continuing criminal

enterprise involved 150 kilograms or more of a quantity of a mixture and substance containing a

detectable amount of cocaine;

It is further alleged that the continuing criminal enterprise received in excess of ten million

dollars ($10,000,000.00) in gross receipts during any twelve (12) month period of its existence

after December 17, 1997, for the manufacture, importation, and distribution of a mixture and

substance containing a detectable amount of cocaine.

It is further alleged that the continuing series of violations of Title 21, committed by the

defendant included, but were not limited, to the following:

a.) The importation of approximately 8671 kilograms of a mixture and substance containing a detectable amount of cocaine from Colombia, through Mexico and into the United States in or about February through March, 1999.

b.) The attempted importation of approximately 3538 kilograms of a mixture and substance containing a detectable amount of cocaine from Ecuador and into the United States in or about August, 1999.

c.) The importation of approximately 740 kilograms of a mixture and substance containing a detectable amount of cocaine from Columbia and into the United States at the Port of Houston, in the Southern District of Texas, on or about August 30, 1999.

All in violation of Title 21, United States Code, Section 848 (a),(b) and (c).

## COUNT II

From on or about December 17, 1997, through on or about November 4, 1999, at Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
FABIO OCHOA-VASQUEZ,
a/k/a "Julio,"
a/k/a "Pepe,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,

a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a"Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
NELSON ALBERTO GIRALDO-PALACIO,
a/k/a "Palustre,"
a/k/a "Albanil,"
a/k/a "Inginero Luis Salgado,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"
ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
MAURICIO MEJIA TORO
a/k/a "Suchi,"
a/k/a "Motorola,"
FREDDY IVAN OCHOA-MEJIA,
a/k/a "Andres,"
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
DARIO ECHEVERRY,
EVER VILLAFANE-MARTINEZ,
a/k/a "Juancho,"
MARIO ASTAIZA,

a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
EDWIN GONZALEZ-ARBELAEZ,
a/k/a "Edwin Gonzalez,"
a/k/a "Juan Guillermo Arbelaez Diaz,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
CARLOS MARIO LOPEZ MOLINA,
a/k/a "Carlos Mario Londono Botero,"
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo,"and
LUIS CARLOS ZULUAGA QUICENO,
a/k/a "Marco Antonio Arboleda Saldarriaga,"

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to distribute, and to possess with the intent

to distribute, five (5) kilograms or more of a mixture and substance containing a detectable

amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United

States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## COUNT III

From on or about December 17, 1997, through on or about November 4, 1999, at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
FABIO OCHOA-VASQUEZ,
a/k/a "Julio,"
a/k/a "Pepe,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a"Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
NELSON ALBERTO GIRALDO-PALACIO,
a/k/a "Palustre,"
a/k/a "Albanil,"
a/k/a "Inginero Luis Salgado,"
JAIRO SANCHEZ-CRISTANCHO,
a/k/a "Jota,"
HERNAN ABELARDO GOMEZ-MORENO,
LUIS FERNANDO REBELLON-ARCILA,
a/k/a "Jimmy,"
CARLOS JARAMILLO,
HERMIS DE JESUS BETANCOURT-RIOS,
a/k/a "Saulo,"
JORGE MAURICIO SANCHEZ-VIDAL,
a/k/a "Mao,"
JOSE WALTER SEPULVEDA-RIOS,
a/k/a "El Apa,"

ADRIANA MARCELA VACCA-BOJACA,
CARLOS SANCHEZ,
MAURICIO MEJIA TORO
a/k/a "Suchi,"
a/k/a "Motorola,"
FREDDY IVAN OCHOA-MEJIA,
a/k/a "Andres,"
ALFREDO TASCON,
a/k/a "Alfredito,"
JAVIER LINDO,
a/k/a "El Gordo,"
DARIO ECHEVERRY,
EVER VILLAFANE-MARTINEZ,       .
a/k/a "Juancho,"
MARIO ASTAIZA,
a/k/a "Marciano,"
CARLOS CARDENAS,
a/k/a "Caliche,"
BERNARDO ALBERTO SANCHEZ-NORENA,
a/k/a "Don Bernardo,"
HECTOR MARIO LONDONO-VASQUEZ,
a/k/a "El Negro,"
OSCAR ARTURO CAMPUZANO-ZAPATA,
a/k/a "El Flaco,"
RICARDO PASTOR OCHOA-RUIZ,
a/k/a "Camilo,"
EDWIN GONZALEZ-ARBELAEZ,
a/k/a "Edwin Gonzalez,"
a/k/a "Juan Guillermo Arbelaez Diäz,"
SANTIAGO VELEZ VELAZQUEZ,
a/k/a "Negro Velez,"
MARIO GERMAN LOPEZ CARDONA,
a/k/a "Pedro,"
SERGIO PERDOMO LIEVANO,
CARLOS MARIO LOPEZ MOLINA,
a/k/a "Carlos Mario Londono Botero,"
FERNANDO ANTONIO ESQUIVIA SOTELO,
a/k/a "Nando," "Cirilo," and
LUIS CARLOS ZULUAGA QUICENO,
a/k/a "Marco Antonio Arboleda Saldarriaga,"

did knowingly and intentionally combine, conspire, confederate and agree with each other, and

with persons known and unknown to the Grand Jury, to import into the United States from a

place outside thereof, a quantity of five (5) kilograms or more of a mixture and substance

containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in

violation of Title 21, United States Code, Section 952.

All in violation of Title 21, United States Code, Section 963.

## COUNT IV

From on or about December 17, 1997, through on or about November 4, 1999, at

Broward and Dade Counties, in the Southern District of Florida, the Republic of Colombia, the

Bahamas, the Republic of Mexico, and elsewhere, the defendants,

ALEJANDRO BERNAL-MADRIGAL,
a/k/a "Juvenal,"
a/k/a "Tony,"
ARMANDO VALENCIA,
a/k/a "Juanito,"
a/k/a "Luis Valencia-Valencia,"
ALBERTO GALLEGO,
a/k/a "El Doctor,"
MARTHA NUBIA RESTREPO ISAZA,
a/k/a "Lucia,"
GUILLERMO MORENO-RIOS,
a/k/a "Memo,"
a/k/a "El Pelon,"
JAIRO de JESUS MESA-SANIN,
a/k/a "Paco,"
a/k/a "Cristian,"
a/k/a "Cunado,"
ORLANDO SANCHEZ-CRISTANCHO,
a/k/a "Martin,"
a/k/a "Orlan,"
a/k/a "Tono,"
JAIME GONZALO CASTIBLANCO-
CABALCANTE,
a/k/a "Chalito,"
a/k/a "Sergio,"
RAMIRO VANOY-RAMIREZ,
a/k/a "Cuco,"
a/k/a "Marcos,"
JAIRO SANCHEZ-CRISTANCHO,

States Currency and (2) is derived from specified unlawful activity, as that term is defined in Title

18, U S C. Section 1956(a) (7)(B)(i) and (C), in violation of Title 18, United States Code, Section

1957(a)

      All in violation of Title 18, United States Code, Section 1956(h)

                A TRUE BILL

                _Richard M. Sloan_
                FOREPERSON

THOMAS E. SCOTT
UNITED STATES ATTORNEY

THERESA M. B. VAN VLIET
ASSISTANT UNITED STATES ATTORNEY

GLENN C. ALEXANDER
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE

EDWARD R. RYAN
ASSISTANT UNITED STATES ATTORNEY

Certified to be a true and correct copy of the document on file
Clarence Maddox  Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 11-18-99

## EXHIBIT C – STATUTES

1.   Title 21, United States Code, Section 841 –
     Prohibited Acts (Drugs)............................1

2.   Title 21, United States Code, Section 846 –
     Drug Attempt and conspiracy.........................2

3.   Title 21, United States Code, Section 848 –
     Continuing Criminal Enterprise....................3

4.   Title 21, United States Code, Section 952 –
     Importation of controlled substances...............4

5.   Title 21, United States Code, Section 963 –
     Drug Importation Attempt and conspiracy.............5

6.   Title 21, United States Code, Section 960–
     Importation of controlled substances; penalties......6

7.   Title 18, United States Code, Section 1956 –
     Money Laundering....................................7

8.   Title 18, United States Code, Section 1957 –
     Money Laundering....................................9

## EXHIBIT C – STATUTES

**1. Title 21, United States Code, Section 841 -- Prohibited Acts**
**(Drugs)**

"(a) Unlawful acts --

    Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--
    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
    (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

(b) Penalties

    Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
    (1)(A) In the case of a violation of subsection (a) of this section involving--...

    (ii) 5 kilograms or more of a mixture or substance containing a detectable amount of--
    (I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;
    (II) cocaine, its salts, optical and geometric isomers, and salts of isomers;...

    such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. .... Any sentence under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein."

1

## 2. Title 21, United States Code, Section 846 — Drug Attempt and conspiracy

"Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

### 3. Title 21, United States Code, Section 848 -- Continuing Criminal Enterprise

"(a) Penalties; forfeitures

Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $2,000,000 if the defendant is an individual ....  and to the forfeiture prescribed in section 853 of this chapter; ....

(b) Life imprisonment for engaging in continuing criminal enterprise

Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) of this section if--

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

(2)(A) the violation referred to in subsection (c)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

(c) "Continuing criminal enterprise" defined

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if--
(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--
(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
(B) from which such person obtains substantial income or resources.

(d) Suspension of sentence and probation prohibited

In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted..."

**3**

**4. Title 21, United States Code, Section 952 — Importation of controlled substances**

"(a) Controlled substances in schedule II ....

It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule ...II of subchapter I of this chapter, ...."

**4**

## 5. Title 21, United States Code, Section 963 — Drug Importation Attempt and Conspiracy

"Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

**6. Title 21, United States Code, Section 960 -- Prohibited Acts**
**(Drugs)**

"(a) Unlawful acts --

Any person who--

(1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,

shall be punished as provided in subsection (b) of this section.

(b) Penalties

(1) In the case of a violation of subsection (a) of this section involving--

(B) 5 kilograms or more of a mixture or substance containing a detectable amount of--

(i) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(ii)cocaine, its salts, optical and geometric isomers, and salts or isomers;

the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than 20 years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. ....Any sentence under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this paragraph. No person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein.

**7. Title 18, United States Code, Section 1956 -- Money Laundering**

"(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of specified unlawful activity;....or

(B) knowing that the transaction is designed in whole or in part--

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;  or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

(A) with the intent to promote the carrying on of specified unlawful activity;....

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.

(c) As used in this section--

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

(2) the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

(3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of

any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

(4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

(5) the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

(6) the term "financial institution" has the definition given that term in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder;

(7) the term "specified unlawful activity" means--

(A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

(B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving--

(i) the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);....

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if--

(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States;  and

(2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000....

(h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

**8**

**8. Title 18, United States Code, Section 1957 – Money Laundering**

    **(a)** Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)....

    **(d)** The circumstances referred to in subsection (a) are –

    **(1)** that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States;

## EXHIBIT D -- STATUTE OF LIMITATIONS

### Title 18, United States Code, Section 3282
### Statute of Limitations -- Offenses not capital

"Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment .... is instituted within five years next after such offense shall have been committed."

According to the above statute of limitations, the charges in this Indictment are effective if brought within five years from the commission of the last date charged in furtherance of the conspiracy. In this case for each of the counts in the superseding indictment the last date charged is November 4, 1999. As a result each of the counts charged in the indictment are timely, inasmuch as each violation has been charged in the indictment within five years of the date that it was committed or the last act in furtherance of the violation was committed.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 99-6153 CR-RYSKAMP(s)(s)(s)(s)

IN THE MATTER OF THE
EXTRADITION OF RAMIRO
VANOY-RAMIREZ
_____/

WEST PALM BEACH,
PALM BEACH COUNTY, FLORIDA
UNITED STATES OF AMERICA

PAUL K. CRAINE, having first been duly sworn, deposes and states as follows:

<u>INTRODUCTION</u>

1.  I am a citizen of the United States and am 37 years of age.  I currently reside in

Bogota, Colombia.  I am employed as a Special Agent, United States Department of Justice, Drug

Enforcement Administration (DEA) and have been so employed for approximately 10 years.  I am

currently assigned to the Bogota, Colombia Country Office and have been there for approximately

2 1/2 years.  Prior to my employment with DEA, I was a police officer with the Fulton County,

Georgia Police Department for five (5) years.  Special Agent Nicholas Kolen, DEA, and I are the

Bogota-based agents responsible for the investigation in the case of *United States vs. Alejandro*

*Bernal Madrigal, et al.*, Case No. 99-6153 CR-RYSKAMP (s)(s)(s)(s).

2.  On September 30, 1999, a Federal Grand Jury sitting in Fort Lauderdale, Broward

County,  Florida, returned a second superseding indictment in Case Number 99-6153 CR-

RYSKAMP(s)(s)  charging ALEJANDRO BERNAL MADRIGAL and others with a number of

violations of United States criminal law.  On September 30, 1999, the Honorable Barry S. Seltzer, United States Magistrate Judge, United States District Court for the Southern District of Florida issued arrest warrants for all of the defendants named in the indictment.  This second superseding indictment was the basis for the provisional arrest requests which were submitted to the Republic of Colombia.

    3.  On November 4, 1999, a third superseding indictment Case Number 99-6153 CR-RYSKAMP(s)(s)(s), was returned by the same Federal Grand Jury sitting in Fort Lauderdale, Broward County, in the Southern District of Florida.  The third superseding indictment replaced the second superseding indictment.  The defendants are charged with the same violations of United States laws in the third superseding indictment as they were in the second, but the third superseding indictment specified some of the violations of United States drug laws which support the charge in Count I of the indictment against ALEJANDRO BERNAL MADRIGAL and added alias names of previously charged defendants.  On November 18, 1999, a fourth superseding indictment was returned by the same Federal Grand Jury.  The fourth superseding indictment corrected a typographical error contained in the third superseding indictment relating to the date on which the crimes charged in the indictment concluded.  The fourth superseding indictment (hereinafter referred to as the indictment) charged violations of United States drug and money laundering laws, specifically that:

       a.  from on or about December 17, 1997, continuing through on or about November 4, 1999,  ALEJANDRO BERNAL MADRIGAL knowingly and intentionally engaged in a continuing criminal enterprise, as that term is defined in Title 21, United States Code, Section 848(c), in that he knowingly and intentionally committed a felony violation of

Title 21, United States Code; that such violation was part of a continuing series of violations of Title 21, United States Code, undertaken by BERNAL in concert with five or more persons with respect to whom BERNAL occupied a position of principal administrator, organizer and leader of the continuing criminal enterprise, and from which activity BERNAL obtained substantial income and resources. It is further alleged that as part of this continuing criminal enterprise the violations involved 150 kilograms or more of a quantity of a mixture and substance containing a detectable amount of cocaine; and that the enterprise received in excess of ten million dollars in gross receipts during any twelve (12) month period of its existence after December 17, 1997, for the manufacture, importation and distribution of a mixture and substance containing a detectable amount of cocaine, all in violation of Title 21, United States Code, Section 848 (a)(b)and (c), (Count I);

b. from December 17, 1997, continuing through on or about November 4, 1999, the named defendants knowingly and intentionally combined, conspired, confederated and agreed with others known and unknown to possess with intent to distribute five (5) kilograms or more of a quantity of a mixture and substance containing a detectable amount of cocaine, all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, (Count II);

c. from December 17, 1997, continuing through on or about November 4, 1999, the named defendants knowingly and intentionally combined, conspired, confederated and agreed with others known and unknown to import into the United States from a place outside thereof five (5) kilograms or more of a quantity of a mixture and substance

containing a detectable amount of cocaine, all in violation of Title 21, United States Code, Sections 952 and 963, (Count III);

d. from December 17, 1997, continuing through on or about November 4, 1999, the named defendants knowingly and willfully combined, conspired, confederated and agreed with others known and unknown to

    i)        knowingly and willfully conduct financial transactions affecting interstate and foreign commerce which involved the proceeds of a specified unlawful activity, that is, the receiving, concealment, buying, selling and otherwise dealing in narcotic and dangerous drugs punishable under the laws of the United States, intending to promote the carrying on of said specified unlawful activity and, to conduct such financial transactions, knowing that the property involved in the financial transactions, that is, the funds and monetary instruments, represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i),

    ii)        knowingly and willfully conduct financial transactions affecting interstate and foreign commerce which involved the proceeds of a specified unlawful activity, that is, the receiving, concealment, buying, selling and otherwise dealing in narcotic and dangerous drugs punishable under the laws of the United States, knowing that the transactions were designed in whole and in part to conceal the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, and to conduct such financial transactions knowing that the property involved in the financial transactions, that is, funds and monetary

4

instruments, represented the proceeds of some form of unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1)(B)(i),

iii)      within the United States, knowingly to engage and attempt to engage in a

monetary transaction in criminally derived property that (1) is of a value greater

than $10,000 in United States Currency and (2) is derived from specified unlawful

activity, as that term is defined in Title 18, United States Code, Section 1956

(a)(7)(B)(i) and (C), in violation of Title 18, United States Code, Section 1957(a).

All in violation of Title 18, United States Code, Section 1956(h), (Count IV).

4.  This affidavit is submitted in support of the request of the United States of America for

the extradition of named defendants who are believed to be in Colombia[1] and, in particular, the

above referenced individual.  I based this affidavit upon:

a.  My personal knowledge of the facts and circumstances leading to this indictment;

b.  information relayed to me during the course of my official duties by other law

enforcement officials in the Bahamas, Colombia, Ecuador, Mexico and the United States;

c.  review of monitors' summaries of communications intercepted by U.S. or Colombian

law enforcement officials in accordance with the laws of the country in which the

interception took place;

d.  review of documentary and tangible evidence corroborating those intercepted

---

[1] Attached as Exhibit A to my affidavit is a list of the defendants believed to be in
Colombia, the Counts in which they are named, and whether they are in the custody of the
Colombian authorities at this time.

5

communications and the charges in the above referenced indictment[2]; and

e. my training and experience as a law enforcement official and investigator.

5. I have provided an overview of the nature of the investigation leading to the indictment in this case; the nature of and interrelationship among the criminal organizations which associated with each other to accomplish the illegal activities charged in the indictment; the role of the defendants in conducting and facilitating those criminal activities; and highlights of the evidence against each individual defendant whose extradition is sought herein.

<u>NATURE OF THE INVESTIGATION</u>

6. ALEJANDRO BERNAL MADRIGAL, a/k/a "JUVENAL" a/k/a "TONY," (hereinafter referred to as BERNAL) has been engaged in drug trafficking activities since at least the 1980s when he was closely associated with the Medellin kingpins and with select North Coast or Cali traffickers such as Ivan Urdinola Grajales. In 1981, BERNAL represented the drug trafficking and money laundering interests of the Ochoas, Medellin-based drug traffickers, in Los Angeles, California. Through that association, he began to work with significant Mexican traffickers such as Ernesto Fonseca Carrillo. In 1989, BERNAL was imprisoned in Mexico with Fonseca Carrillo, who was the uncle of Amado Carrillo Fuentes, who grew to be one of the most significant Mexican drug traffickers by the mid 1990s. After his release from the Mexican jail, BERNAL began to work with Carrillo Fuentes in the years immediately prior to Carrillo Fuentes' death in July, 1997. BERNAL represented the Colombian traffickers in their dealings with

---

[2] On October 13, 1999, Colombian law enforcement authorities also executed several searches, resulting in the seizure of literally thousands of documents and records of evidentiary value. In addition to the Colombian searches, judicially authorized searches have been conducted in the United States resulting in evidence and information relevant to the charges in this indictment.

6

Carrillo Fuentes and also became a trafficking force in this own right after the Medellin and Cali Cartels were largely disbanded by law enforcement actions in Colombia and the United States. By his own admission, BERNAL was responsible for the importation into the United States of 60 tons of cocaine per month during the time he worked with Carrillo Fuentes.

7. BERNAL was, therefore, a significant target of law enforcement scrutiny in the United States and Colombia. On March 2, 1999, the Colombian National Police began to execute electronic surveillance orders in Colombia. These orders were obtained by the Fiscalia General of the Republic of Colombia in accordance with Colombian law and in response to a request for judicial assistance by the United States of America pursuant to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, done at Vienna, December, 1988 (the Vienna Convention). From March 2, 1999, through the culmination of the Colombian phase of the investigation on October 13, 1999, a total of 180 communications devices were the subject of interceptions (71 hardline telephone/facsimiles, 71 cellular telephones and 38 pagers).

8. In addition to these telephone/facsimile and pager interceptions, the Colombian National Police monitored authorized electronic interception devices placed in the BERNAL's Bogota office suite, Casa Bonita, Calle 125, No. 30-67, Bogota, Colombia, beginning on March 2, 1999. Based upon the communications intercepted in BERNAL's office it is clear that the office suite was a central meeting place for BERNAL, his employees, associates and customers. The office was used as a location to discuss the day to day operations of the drug trafficking and money laundering activities in which the defendants engaged.

9. On October 13, 1999, the Fiscalia General of the Republic of Colombia and the Colombian National Police, under the observation of the Procuraduria General of the Republic of

7

Colombia in accordance with Colombian law, executed the United States' requests for the provisional arrest of Colombia-based defendants named in the indictment. A total of 30 defendants were arrested in Colombia on October 13, 1999, pursuant to the provisional arrest requests.[3]

## THE CRIMINAL ORGANIZATIONS

10. This investigation revealed an interrelationship among distinct drug trafficking organizations that enabled them to sell greater amounts of cocaine and reap greater profits by joining together in a kind of criminal consortium. The hub of this consortium was ALEJANDRO BERNAL MADRIGAL who provided various services to facilitate the drug trafficking and money laundering activities of most of the significant and prolific traffickers operating in Colombia. These services ranged from sharing his established drug trafficking routes from South America, through Mexico and into the United States to providing his coconspirators with what were believed to be "secure" communications over cloned cellular telephones. The investigation revealed that BERNAL used a number of routes to transport cocaine from South America into the United States. Most of those routes went directly through Mexico. Others, such as the route known as "Mimos," sometimes went through the Caribbean. Based on evidence obtained from the conversations intercepted in Colombia, BERNAL used the following routes, among others, to transport cocaine into the United States:

a. "La Flaca" – the route was so named by the BERNAL organization because the cocaine kilograms were thinly packaged in order to fit up to 1,500 kilograms per shipment in

_____

[3] Defendant GUILLERMO MORENO RIOS, a/k/a "Memo," was arrested in Mexico on October 13, 1999.

billiard tables which were used to secret the cocaine during transit from South America, through Mexico and into the United States;

b. "Mimos" – this route was used on several occasions and usually consisted of between 600 to 1,000 kilograms of cocaine secreted in frozen fruit pulp. In addition to specific references to use of this route in conversations intercepted in ERNAL's office, law enforcement authorities seized 740 kilograms of cocaine on August 30, 1999, at the Port of Houston, Texas as a direct result of leads from conversations intercepted in this investigation;

c. "No Name" – BERNAL used an unnamed route which began near the city of Tumaco on the Pacific coast of Colombia where cocaine would be taken in fast boats to fishing vessels and then transported to the Pacific coast of Mexico. The cocaine would then be off loaded to waiting fast boats, transported to the Mexican shore for subsequent overland transportation into the United States; and

d. "Cloros," also known as "La Gorda" – BERNAL and BERNARDO SANCHEZ NORENA utilized metal cylinders designed to ship chlorine to conceal thousands of kilograms of cocaine. The cylinders were transported from Medellin, Colombia to Ecuador and then on to Guatemala for subsequent importation into the United States through Mexico. Evidence of the use of this route comes not only from the defendants through their intercepted communications, but also from the seizure of approximately 3,538 kilograms of cocaine in early August, 1999, in Quito, Ecuador, as a result of information obtained from the intercepted communications.

11. By joining together, the major drug trafficking organizations minimized the chances of betraying rivals' operations to Colombian or U.S. law enforcement to the same extent that took place between the Medellin and Cali drug Cartels. They also reduced overhead by pooling loads

9

of cocaine and by using BERNAL's central contact point in Mexico – defendant ARMANDO VALENCIA.[4]

## DEFENDANTS SOUGHT FOR EXTRADITION

12. **ALEJANDRO BERNAL MADRIGAL, a/k/a "JUVENAL," a/k/a "TONY"** - The evidence gathered in this investigation revealed that BERNAL was the leader of a major Colombian cocaine trafficking and money laundering organization. BERNAL utilized his office, in a multi-story office building in Bogota, Colombia, as a location to conduct meetings with the leaders of other Colombian trafficking organizations from Bogota, Medellin and Cali. These meetings served as a forum to coordinate the transportation of multi-ton amounts of cocaine to Mexico and the United States and to launder multi-million dollar amounts in drug proceeds.

13. On March 25, 1999, in BERNAL's office located in Bogota, Colombia, BERNAL met with defendants LUIS FERNANDO REBELLON ARCILA (REBELLON) and JAIRO SANCHEZ CRISTANCHO and discussed with them specific financial details relating to a recent shipment of 8,671 kilograms of cocaine from Colombia to defendant ARMANDO VALENCIA in Mexico. VALENCIA was BERNAL's primary -- if not sole -- point of contact in Mexico and he used VALENCIA and his organization to transport all of the cocaine he shipped from South America through Mexico and into the United States. The conversation among BERNAL, REBELLON and JAIRO SANCHEZ CRISTANCHO amounts to an accounting of the precise amounts of money charged and owed for the transportation of the load. From those figures, law enforcement officials determined that there were 8,671 kilograms of cocaine successfully

---

[4] VALENCIA is a Mexican national and is believed to be hiding in Mexico. He is not a subject of a provisional arrest or extradition request to Colombia.

10

transported from Colombia to Mexico for subsequent importation into the United States. As in most of BERNAL's shipments, this load was a shared load. At least 2,000 kilograms of the cocaine contained in the shipment belonged to drug trafficker Diego Montoya Sanchez, a significant Colombian trafficker who is not named in this indictment (although many of his close associates are) and who is currently a fugitive from Colombian justice.

14. In April of 1999, evidence obtained from intercepted conversations in BERNAL's office and telephone intercepts conducted in Medellin, Colombia, revealed that BERNAL and his associates had shipped cocaine using the "Mimos" route. The cocaine was concealed in frozen fruit pulp, from Cartagena, through the Caribbean and then on to VALENCIA in Mexico.[5] Information relating to the shipment was passed to the Bahamian police and the DEA in Freeport, Bahamas. On April 12, 1999, the container was searched by Bahamian law enforcement in Freeport with negative results. On April 28, 1999, conversations between BERNAL, HECTOR LONDONO VASQUEZ and JAIRO SANCHEZ CRISTANCHO, were intercepted in BERNAL's office in Bogota, in which they discussed the fact that the load had escaped detection in Freeport, had proceeded on the ship to South Florida, and then on to Mexico. They commented that if they had known that the ship was going to be rerouted to South Florida after the search, they would have had BERNAL organization members in Miami ready to receive the load directly. In fact, the shipment was rerouted directly to Mexico – a fact which the conversants were unaware of at the time. We estimate from the above referenced discussion and the details contained therein that the load was at least 600 kilograms.

---

[5] Unless otherwise indicated in the body of this affidavit, to the best of my knowledge all of the cocaine received by VALENCIA and his organization in Mexico was intended to be subsequently imported into the United States.

11

15. On June 16, 1999, the Colombian National Police intercepted conversations which took place in BERNAL's office in Bogota in which BERNAL, ALFREDO TASCON, JOSE WALTER SEPULVEDA RIOS, ALBERTO GALLEGO, FABIO OCHOA VASQUEZ and RICARDO PASTOR OCHOA RUIZ were participants. They discussed the shipment of 5,000 kilograms of cocaine, which was planned to be a joint venture or shared load among BERNAL, TASCON, SEPULVEDA, and OCHOA RUIZ. From intercepted conversations it is apparent that GALLEGO's role in BERNAL's organization was to serve as the Chief Financial Officer and to take responsibility for all the financial transactions and investments on behalf of the organization, including laundering the drug proceeds. FABIO OCHOA did not participate directly in the load by providing cocaine to add to the overall shipment, but rather furthered and facilitated the shipment by making a financial investment, and serving as a kind of counsel or mentor to BERNAL.

16. On August 13 through 17, 1999, a total of 3,538 kilograms of cocaine was seized by Ecuadorean law enforcement officials in Quito, Ecuador. The cocaine had been secreted in large metal chlorine tanks. The seizure resulted from evidence obtained from intercepted conversations from BERNAL's office in Bogota, Colombia, telephone intercepts conducted by the Colombian National Police in Medellin, Colombia, and physical surveillance conducted by the Colombian National Police and Ecuadorean law enforcement authorities. These collective sources revealed that BERNARDO SANCHEZ, a major Medellin-based Colombian cocaine trafficker had coordinated the shipment. SANCHEZ had previously visited BERNAL's office in Bogota and had discussed with BERNAL the use of this method, known as the "Cloros" route, to transport cocaine from Colombia through Ecuador, Guatemala and ultimately to VALENCIA in Mexico.

12

16.  On October 5, 1999, the Colombian National Police intercepted a conversation in BERNAL's office in Bogota, between BERNAL and BERNARDO SANCHEZ.  SANCHEZ told BERNAL about various problems he was having as a result of the seizure of the cocaine in Quito in August, 1999, and the exposure of the "Cloros" route.  SANCHEZ also told BERNAL that the person who they believed had compromised the route had been killed.

17.  On August 30, 1999, the United States Customs Service seized 740 kilograms of cocaine from a container at the Port of Houston, Texas, based upon information provided to them from evidence obtained from intercepted conversations in the office, on telephones in Medellin and based upon surveillance by law enforcement in Colombia and the United States.  The cocaine, which had been sent using the "Mimos" route, was concealed in frozen fruit pulp at a facility in Medellin, Colombia, and then placed in a maritime shipping container. The container was then transported by ship from Colombia and eventually seized at the Port of Houston, where the ship had stopped en route to Mexico.

18.  On October 7, 1999, the Colombian National Police intercepted conversations from BERNAL's office in Bogota, Colombia, in which BERNAL made a reference to his cocaine route, "Mimos"' and that 700 kilograms of cocaine had been seized the previous month in Houston, Texas.

19.  **FABIO OCHOA VASQUEZ, a/k/a "JULIO," a/k/a "PEPE,"** - Based on comments made by BERNAL during conversations intercepted from BERNAL's office, it is clear that he enjoyed a long standing and close professional and personal relationship with FABIO OCHOA VASQUEZ.   In a conversation between BERNAL and Alexandra Molano which was intercepted on April 28, 1999, in BERNAL's office in Bogota, BERNAL told Molano about his

13

past professional association with the Ochoa Vasquez brothers and, in particular, with FABIO.
BERNAL told Molano that he thought of FABIO OCHOA as his brother and that BERNAL
worked for the Ochoas in the 1980's in California, during which time he worked with FABIO
OCHOA to represent the family's drug and money laundering interests.

20.   In a conversation intercepted in BER`    L's office on April 28, 1999, BERNAL and
JAIRO SANCHEZ CRISTANCHO discussed a financial transaction they had engaged in with
"Fabito" (FABIO OCHOA).  BERNAL reviewed accounts from several different narcotics
shipments with JAIRO SANCHEZ CRISTANCHO and his brother MAURICIO SANCHEZ
CRISTANCHO.  During this conversation, BERNAL mentioned that OCHOA owned 930
kilograms of cocaine on one of the shipments BERNAL's had sent to Mexico.

21.   In a conversation intercepted in BERNAL's office on May 25, 1999,  BERNAL was
heard on the telephone discussing with an unknown person details concerning who was
responsible for administering FABIO OCHOA's, " properties."  On that same day, BERNAL
discussed with an unidentified female known only as "Monica," the fact that she could provide
investment opportunities in foreign companies which could be used to launder BERNAL's drug
money. Monica told BERNAL that she has numerous other clients in Medellin for whom she
provided these money laundering services and gave FABIO OCHOA as a reference.  Later that
day, BERNAL spoke with an unindicted co-conspirator who was a  representative of a
Colombian North Coast Trafficking Organization.  BERNAL said that Tomas Bravo was the
person in charge of managing FABIO OCHOA's drug trafficking activities.  BERNAL was
informed that the unindicted co-conspirator would send Mario Restrepo to visit FABIO OCHOA
and confirm where OCHOA wanted "it," which I believe from the context and content of the

14

interception to refer to drugs or the proceeds from the sale of drugs.

22. In a conversation intercepted on June 2, 1999, in BERNAL's office, BERNAL and REBELLON discussed whether BERNAL should solicit the help of FABIO OCHOA in reducing the presence of Colombian guerrillas on BERNAL's properties.

23. In a conversations intercepted on June 16, 1999, in BERNAL's office, BERNAL conducted a series of meetings. Some of the attendees of these meetings included FABIO OCHOA, ALFREDO TASCON, JAIRO SANCHEZ, HECTOR MARIO LONDONO, RICARDO PASTOR OCHOA, LUIS FERNANDO REBELLON.

During these meetings, BERNAL, OCHOA and others discussed their plans to do a joint transportation of multi-ton amounts of cocaine from Colombia to VALENCIA and his organization in Mexico. BERNAL, OCHOA and the others discussed the financial arrangements needed to purchase the cocaine and pay for the transportation. BERNAL also said that in 1981, ORLANDO SANCHEZ CRISTANCHO worked for FABIO OCHOA in Los Angeles, California, along with BERNAL.

BERNAL and OCHOA discussed the details of conversations that BERNAL had with GUILLERMO MORENO RIOS and ARMANDO VALENCIA during BERNAL's meeting with them in Cuba generally detailing the narcotics and money laundering activities of the two organizations run by BERNAL and VALENCIA. At one point during the meeting in BERNAL's office on June 16, 1999, FABIO OCHOA also told BERNAL that he had met recently with Carlos Meza and that if BERNAL needed a new route to transport drugs that BERNAL should contact Meza.

24. In a conversation intercepted on June 29, 1999, in BERNAL's office, BERNAL had a

15

discussion with EVER VILLAFANE regarding a recent financial transaction involving $980,000.00 that OCHOA had sent.

25. In a conversation intercepted on July 8, 1999, in BERNAL's office, HECTOR MARIO LONDONO told BERNAL that FABIO OCHOA helped LONDONO with his trafficking routes and had assisted LONDONO to acquire an airplane that LONDONO utilized in his trafficking routes. LONDONO also discusses with BERNAL, in detail, drug money laundering transactions involving BERNAL and OCHOA.

26. In an conversation intercepted on July 9, 1999, in a telephone conversation from Colombia, FABIO OCHOA told BERNAL that OCHOA was concerned about people cooperating in the "Trans Atlantico" case, [6] specifically mentioning a female defendant who is the subject of an extradition request to Colombia in that case. There is discussion between BERNAL and OCHOA regarding ensuring that a certain unnamed lawyer in the U.S. represent the woman to ensure that she does not cooperate with authorities.

27. **ALBERTO de JESUS GALLEGO, a/k/a "EL DOCTOR"** - Based upon the evidence gathered during the course of this investigations, and form the intercepted conversations from BERNAL's office in Bogota, it is clear that GALLEGO is among BERNAL's most trusted confidants and serves as his Chief Financial Officer. GALLEGO traveled to Mexico regularly on behalf of BERNAL and negotiated with VALENCIA on BERNAL's behalf. GALLEGO regularly visited BERNAL's office and engaged in telephone conversations with BERNAL and other coconspirators.

---

[6] This is a reference to an ongoing criminal case in United States District Court for the Southern District of Florida.

28.  In a conversation intercepted on May 3, 1999, in BERNAL's office, BERNAL mentioned the fact that GALLEGO maintained the accounting records for BERNAL's narcotics and money laundering organization on a computer in GALLEGO's office.

29.  In a conversation intercepted on May 4, 1999, in BERNAL's office, BERNAL went on at length, in GALLEGO's presence, about his past narcotics trafficking activities, his (BERNAL's) relationship with ORLANDO SANCHEZ CRISTANCHO dating from the times each of them worked for the OCHOAs in California, and about a discussion between GUILLERMO MORENO RIOS and BERNAL about a trip they planned to make to Cuba to meet with ARMANDO VALENCIA and discuss narcotics trafficking and money laundering.  It should be noted that subsequent investigation confirms that the meeting took place and that the participants were uncomfortable with meeting in Cuba again because they had been subjected to surveillance.  It should also be noted that there is no evidence that has been uncovered in this investigation that suggests that any Cuban official was involved with the meeting.

30.  In a conversation intercepted on June 10, 1999, in BERNAL's office, BERNAL GALLEGO and LONDONO had a detailed discussion regarding a shipment of cocaine to Mexican trafficker ARMANDO VALENCIA and specific payment amounts that were owed to various investors in the shipment.  During this conversation, LONDONO specifically discussed the use of the Mimos route, which is set forth in more detail in the portion of this affidavit summarizing his role in the organization.

31.  In a conversation intercepted on June 16, 1999, in BERNAL's office BERNAL and GALLEGO discussed GALLEGO's travel to Mexico and his meetings with ARMANDO VALENCIA.  The purpose of this meeting was to discuss BERNAL's drug trafficking and money

17

laundering agreements with VALENCIA. BERNAL confirmed to others present during the discussion, including FABIO OCHOA, that GALLEGO was his accountant, and that GALLEGO negotiated on BERNAL's behalf with VALENCIA. GALLEGO reported that there was a delay in the meeting because MORENO was unavailable. There was general discussion between BERNAL, JAIRO SANCHEZ CRISTANCHO and GALLEGO regarding the amounts of cocaine that were to be imported through VALENCIA's operations in Mexico. The amounts discussed, depending on which of two options were being considered and how they shared responsibility for the loads, were between 7,000 and 10,000 kilograms of cocaine in each future shipment.

32. In a conversation intercepted on July 7, 1999, in BERNAL's office, BERNAL, FREDDY IVAN OCHOA and GALLEGO talked about GALLEGO's travel to Mexico. GALLEGO detailed his discussions with ARMANDO VALENCIA and his, GALLEGO's, coordination of BERNAL's drug shipments to VALENCIA. GALLEGO also discussed the purchase of an airplane from VALENCIA for BERNAL's use to transport multi-million dollar amounts of drug proceeds from Mexico to Colombia. GALLEGO also discussed a BERNAL coordinated shipment of 14 or 15 tons of cocaine from Colombia to ARMANDO VALENCIA in Mexico that was pending at the time of the intercepted conversation.

33. **MARTHA NUBIA RESTREPO ISAZA, a/k/a "LUCIA"** - Based upon evidence obtained from conversations intercepted by the Colombian National Police which took place in BERNAL's office in Bogota, MARTHA NUBIA RESTREPO operated as one of BERNAL's Bogota based money launderers and served as a "front person" behind whom BERNAL could hide the true ownership of his drug money. She was responsible for moving money through various financial accounts and properties, many of which were in her name. NUBIA often went

18

to BERNAL's office and discussed money laundering and financial matters with BERNAL. She was present during detailed discussions regarding money laundering and actively counseled BERNAL and his associates on the best ways to hide their illegal assets.

34. In a conversation intercepted on March 11, 1999, in BERNAL's office between BERNAL and NUBIA, BERNAL told NUBIA that he had spoken to imprisoned Colombian drug trafficker Lucho Murcia on the telephone. BERNAL instructed NUBIA to accompany defendant HERMIS BETANCOURT to La Picota, where Murcia was incarcerated, and talk to him. The subject of the discussion with Murcia was to be the resolution of an outstanding drug debt owed to ARMANDO VALENCIA by Murcia for 1,500 kilograms of cocaine and $5,000,000.

35. In a conversation intercepted on March 13, 1999, in BERNAL's office, BERNAL stated that NUBIA has been a friend of BERNAL's for his entire life and that he was going to leave room for NUBIA to ship her own cocaine on BERNAL's next drug shipment.

36. In a telephone conversation intercepted on April 13, 1999, between "Olga" and ADRIANA VACCA BOJACA, BERNAL's personal executive assistant, Olga explained that GALLEGO had transferred $7,000,000 of BERNAL's proceeds to NUBIA, which is believed to be a reference to GALLEGO's assignment of the task of laundering those proceeds to NUBIA.

37. **JAIRO DE JESUS MESA SANIN, a/k/a "PACO," a/k/a "CHRISTIAN," a/k/a "EL CUNADO"** – This evidence obtained in this investigation revealed that SANIN's was one of the primary coordinators of BERNAL's drug shipments once the cocaine reached Mexico. SANIN was BERNAL's brother in law and also arranged for the transportation of BERNAL's drug proceeds, to be returned to Colombia from Mexico.

19

38.  In a conversation intercepted on May 3, 1999, in BERNAL's office, between BERNARDO SANCHEZ and BERNAL, BERNAL confirmed to SANCHEZ that SANIN was responsible for the receipt of his drug proceeds in Colombia.

39.  In a conversation intercepted on June 16, 1999, in BERNAL's office between SANIN and BERNAL, BERNAL stated that SANIN was one of those whose primary responsibility was the coordination of the transportation of bulk cash generated from drug sales from Mexico to Colombia.

In this intercepted conversation, LONDONO discussed with BERNAL that SANIN was also responsible for meeting with the organization's unspecified contacts in Guadalajara, Mexico. They discussed the fact that SANIN would be coordinating his activities in Mexico with MORENO and SEPULVEDA and that SANIN would remain in Mexico to receive 5-6 million dollars of BERNAL's drug money for return to Colombia.

LONDONO and BERNAL also discussed the fact that SANIN maintained a house in Guadalajara, Mexico, which had a hidden compartment for storing drug proceeds and that SANIN was recruiting a number of clients for the BERNAL organization.

40.  In a conversation intercepted on August 13, 1999, in BERNAL's office, BERNAL confirmed to NELSON ALBERTO GIRALDO that SANIN would be the main contact to other Mexican Drug trafficking organizations for the BERNAL organization in Mexico.  They went on to discuss various upcoming loads and shipments of cocaine.  BERNAL reiterated that he wanted SANIN to take over the representation of BERNAL's interests with the Mexican traffickers from MORENO, and that SANIN was to handle arrangement for all of BERNAL's shipments of cocaine to Mexico.  BERNAL specifically discussed a shipment of cocaine that was scheduled

20

and which was to be coordinated by SANIN upon its arrival in Mexico. BERNAL also discussed a pending cocaine load of 1,800 kilograms which SANIN was coordinating in Mexico on BERNAL's behalf.

41. **JAIME GONZALO CASTIBLANCO CABALCANTE, a/k/a "CHALITO," a/k/a "SERGIO,"** – The evidence obtained in this investigation revealed that CASTIBLANCO has a long standing relationship with BERNAL and ORLANDO SANCHEZ CRISTANCHO. CASTIBLANCO has been intercepted on several occasions in BERNAL's office discussing money laundering and narcotics activities with BERNAL.

42. In a conversation intercepted on March 26, 1999, in BERNAL's office, BERNAL told GALLEGO that BERNAL had a satellite phone which he used to communicate with, "El Promotor," the head of a trafficking organization in Mexico. BERNAL told GALLEGO that he would give the phone to CASTIBLANCO so that CASTIBLANCO could communicate directly with El Promotor. It should be noted that electronic surveillance conducted in the Miami, Florida phase of this investigation revealed that CARLOS SANCHEZ had purchased a number of "secure" telephones for the organization's use.

43. In a conversation intercepted on May 5, 1999, in BERNAL's office, BERNAL and CASTIBLANCO discussed the fact that in BERNAL's view CASTIBLANCO was responsible for the safe arrival of 2,000 kilograms of cocaine in Mexico on behalf of the BERNAL organization.

44. In a conversation intercepted on May 13, 1999, in BERNAL's office, BERNAL told JAIRO SANCHEZ CRISTANCHO that his brother, ORLANDO, had given CASTIBLANCO an apartment in Cali, Colombia. During this same intercepted conversation, CARLOS JARAMILLO

told BERNAL that JARAMILLO had worked with CASTIBLANCO in drug trafficking. BERNAL mentioned to JARAMILLO that CASTIBLANCO had direct contact with Mexican trafficker, "El Promotor."

45. In a conversation intercepted on July 9, 1999, in BERNAL's office, BERNAL discussed the fact that he would send 5 tons of cocaine to Mexico with CASTIBLANCO and GIRALDO. BERNAL also discussed how the drug proceeds would arrive in Caucasia, Colombia from Mexico and that CASTIBLANCO would be in charge of coordinating the receipt of the money.

46. In a conversation intercepted on July 12, 1999, in BERNAL's office between CASTIBLANCO and BERNAL, they discussed CASTIBLANCO's ownership of a private airplane which the BERNAL organization could use to transport drug proceeds from Mexico to Colombia in case of emergencies -- that is, times during which there were stockpiles of drug proceeds.

47. In a conversation intercepted on August 13, 1999, in BERNAL's office, BERNAL discussed with defendant FREDDY IVAN OCHOA his, BERNAL's, purchase of a private plane to use in a new drug transportation route and that CASTIBLANCO would organize the new route.

48. In a conversation intercepted on August 18, 1999, in BERNAL's office, CASTIBLANCO and SERGIO PERDOMO invited BERNAL to join them in a drug transportation route that they had established. The plan was to send 1,000 kilograms of cocaine from Colombia to Santo Domingo by boat. BERNAL, CASTIBLANCO and PERDOMO discussed the financial needs of the route, the price of cocaine and the potential percentages of

profit among the three.

49. **RAMIRO VANOY RAMIREZ, a/k/a "CUCO," a/k/a "MARCOS,"** – The evidence developed in this investigation revealed that VANOY was a high level member of a right wing Colombian Paramilitary group. VANOY utilized his connections with the Colombian Paramilitaries to provide security at drug laboratories and clandestine airstrips in Colombia which BERNAL, in turn, utilized to repatriate drug proceeds to Colombia from Mexico and export cocaine from Colombia to Mexico, for subsequent transportation into the United States.

50. In a conversation intercepted on June 29, 1999, in BERNAL's office, BERNAL met with an unindicted co-conspirator who served as VANOY's representative. BERNAL discussed the use of a clandestine airstrip in Caucasia, Colombia, to receive BERNAL's drug proceeds from Mexico. In addition to the return of the money, the plane would smuggle guns obtained, in Mexico, for the Paramilitary's use into the airstrip protected by VANOY's troops. During this conversation BERNAL discussed his prior drug dealings with VANOY and that they had cooperated previously in the shipment of 37 tons of cocaine from Colombia and that they never "lost" a single kilogram of cocaine. BERNAL and VANOY's representative discussed in detail the percentages VANOY would charge for allowing planes loaded with money to land at the clandestine airstrip. The representative of VANOY told BERNAL that VANOY was in possession of 3,500 kilograms of cocaine which VANOY needed to move and the representative made clear to BERNAL that VANOY did not want the leader of the Colombian Paramilitary, Carlos Castano, to know of their arrangement to use the airstrip. According to VANOY's representative, they would have to pay Castano a fee to use the airstrip, which would further increase BERNAL's costs and would logically, therefore, decrease the profit to BERNAL and

23

VANOY.

51.  In a conversation intercepted on June 30, 1999, in BERNAL's office, BERNAL told GALLEGO that he planed to meet with VANOY in Caucasia, Colombia, to coordinate with VANOY the transportation of loads of cocaine. BERNAL told GALLEGO that VANOY was in charge of all the Colombian Paramilitary forces in ·e Taraza area of Colombia  and that BERNAL had worked with VANOY before and VANOY had transported 30 tons of cocaine to the United Sates on behalf of BERNAL.

52.  In a conversation intercepted on July 7, 199, in BERNAL's office, GALLEGO reported to BERNAL about the purchase of the plane in Mexico, which BERNAL planned to use to transport money and cocaine between Mexico and Colombia.  GALLEGO reported that VALENCIA was handling all the matters concerning the use of the plane in Mexico and that VANOY would be arranging everything in Colombia.

53.  In a conversation intercepted on July 9, 1999, in BERNAL's office, BERNAL commented to the unknown individuals in the office that he had met recently with VANOY to negotiate the details of the costs associated with a new drug transportation route.

54.  In a conversation intercepted on July 12, 1999, in BERNAL's office, BERNAL and VANOY discussed, in detail, the 3,500 kilograms of cocaine that he controls.  VANOY told BERNAL that he had sold another 5,000 kilograms of cocaine to an unidentified individual, and that he had recently paid $2,000,000 for cocaine base.

BERNAL and VANOY then discussed a shipment of 14 tons of cocaine that BERNAL was coordinating with TASCON and REBELLON. BERNAL told VANOY that he wanted VANOY to be involved in the plan to transport a total of 30 tons of cocaine to Mexico for

24

subsequent importation into the United States.

55. In a conversation intercepted on August 13, 1999, in BERNAL's office, BERNAL, FREDDY IVAN OCHOA and GIRALDO discussed BERNAL's plan to solicit VALENCIA's assistance in securing 100 AK 47 rifles that would be sent back to Colombia and used to protect BERNAL's drugs and money.

56. **NELSON ALBERTO GIRALDO PALACIO, a/k/a "PALUSTRE," a/k/a "ALBANIL," a/k/a "INGINERO LUIS SALGADO,"** – The evidence gathered in this investigation revealed that GIRALDO worked with VANOY and was also a member of the Colombian Paramilitary. GIRALDO was in charge of security at the clandestine airstrip that BERNAL negotiated with VANOY to use to send drug shipments to Mexico for importation into the United States and to receive the return of the drug money. GIRALDO has been present in BERNAL' office on several occasions and was also a close associate of CASTIBLANCO.

57. In a conversation intercepted on April 28, 1999, in BERNAL's office, JAIRO SANCHEZ CRISTANCHO reported to BERNAL that GIRALDO controlled several boats and that the organization paid GIRALDO for recent shipments. BERNAL told JAIRO SANCHEZ CRISTANCHO to tell GIRALDO that BERNAL had 1,000 kilograms of cocaine ready to transport at that time, and that they would have an additional 6-8 tons of cocaine to transport shortly after the conversation. GIRALDO was to receive payment for the transportation once the drug money from the loads was received from Mexico.

58. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL told LONDONO to notify GIRALDO of the quantity of cocaine they were sending and told LONDONO that GIRALDO would help insure the safe arrival of the drugs due to GIRALDO's

contacts.

59.  In a conversation intercepted on  June 29, 1999, in BERNAL's office, BERNAL informed GIRALDO that he would be sending 10 tons of cocaine to Mexico on GIRALDO's boat. GIRALDO told BERNAL that he had recently transported 5-10 tons of cocaine on his boats in secret compartments designed to hide the cocaine.

60.  In a conversation intercepted on August 13, 1999, in BERNAL's office, BERNAL and GIRALDO talk in great detail concerning their present drug trafficking relationship. GIRALDO told BERNAL that he had worked with VANOY, since December, 1998, and that GIRALDO had provided money to VANOY to purchase 10,000 kilograms of cocaine.

61.  **JAIRO SANCHEZ CRISTANCHO, a/k/a "JOTA,"** – The evidence gathered in this investigation revealed that JAIRO SANCHEZ CRISTANCHO was a close and trusted associate of BERNAL's  and was responsible for the day to day coordination of BERNAL's drug trafficking and money laundering activities in Mexico and Colombia. JAIRO SANCHEZ CRISTANCHO regularly traveled between Colombia and Mexico to coordinate these activities for BERNAL.

62.  In a conversation intercepted on March 12, 1999, in BERNAL's office, BERNAL spoke to JAIRO SANCHEZ CRISTANCHO and his brother MAURICIO SANCHEZ VIDAL. SANCHEZ VIDAL discussed JAIRO's duties as the coordinator of BERNAL's drug shipments to VALENCIA in Mexico and they discussed the fact that there is a load of cocaine ready to depart Colombia on the "Mimos" drug route.  BERNAL, MAURICIO and JAIRO then discussed the specific route to be taken and the costs associated with the cocaine load.

63.  In a conversation intercepted on March 25, 1999, in BERNAL's office, BERNAL and

26

JAIRO SANCHEZ CRISTANCHO discussed the pending transportation of 10 tons of cocaine which BERNAL was coordinating with HERMIS BETANCOURT. BERNAL told JAIRO SANCHEZ that he had talked to VALENCIA in Mexico and that he had arranged to receive the proceeds from the drugs within 15 days after the drugs arrived in Mexico. BERNAL told JAIRO SANCHEZ that BERNAL had told MORENO about the arrangement and that JAIRO SANCHEZ had authority to speak on behalf of BERNAL to ARMANDO VALENCIA concerning the 10 ton cocaine load.

64. In a conversation intercepted on April 28, 1999, in BERNAL's office, BERNAL and JAIRO SANCHEZ discussed details of the coordination of pending cocaine and money transactions in Colombia and Mexico. JAIRO SANCHEZ specifically mentioned the search of a shipping container which had been transported through BERNAL's "Mimos" route. JAIRO SANCHEZ described how the container went from Cartagena, Colombia, to Freeport, Bahamas, and that the container was searched in the Bahamas but the cocaine was not found. JAIRO SANCHEZ informed BERNAL that the container eventually was delivered to it's intended destination in Mexico. It is clear that there was an erroneous idea at the time that the ship had transited the Port of Miami, Florida after departing Freeport. Later interceptions and investigation with the shipping company confirmed that the ship that eventually carried the cargo container in which the cocaine was hidden went directly from the Bahamas to Mexico. This "Mimos" load is the same one referred to above in the summary of BERNAL's activities. During this conversation with JAIRO SANCHEZ, BERNAL also told him about the quantities of cocaine that BERNAL was transporting in cooperation with VILLAFANE and defendant MARIO ASTAIZA.

27

65. In a conversation intercepted on May 25, 1999, in BERNAL's office, BERNAL and JAIRO SANCHEZ discussed the details of several drug and money transactions involving BERNAL and VILLAFANE . They also discussed the "Mimos" and "Flaca" drug routes and the possibility of transporting 20 additional tons of cocaine monthly on those routes.

66. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL met with JAIRO SANCHEZ and told him SANIN was in possession of $15,000,000 to $20,000,000 of BERNAL's drug proceeds in Mexico and instructed JAIRO SANCHEZ to coordinate the delivery of the money.

67. **HERNAN ABELARDO GOMEZ MORENO, a/k/a "JULIAN,"** – The evidence obtained in this investigation revealed that GOMEZ was BERNAL's brother in law and one of the chief money launderers for the organization.

68. In a conversation intercepted on March 2, 1999, in BERNAL's office, BERNAL discussed a recent shipment of 8,671 kilograms of cocaine to VALENCIA in Mexico. BERNAL told GOMEZ how he wanted GOMEZ to disperse the proceeds from the sale of the cocaine. BERNAL instructed GOMEZ to turn over the proceeds from VILLAFANE's cocaine transactions that BERNAL had transported to defendant CARLOS CARDENAS. BERNAL also discussed with GOMEZ clients in New York and how they are returning the money from a 5 ton cocaine shipment.

69. In a conversation intercepted on March 25, 1999, in BERNAL's office, BERNAL and JAIRO SANCHEZ discussed a pending 10 ton shipment of cocaine that BERNAL was organizing to be sent to ARMANDO VALENCIA in Mexico. BERNAL told JAIRO SANCHEZ that he wanted GOMEZ to launder the proceeds of that load once they were returned to Colombia.

28

70. **LUIS FERNANDO REBELLON ARCILA, a/k/a "JIMMY,"** – The evidence obtained in this investigation revealed that REBELLON was a close associate of BERNAL and regularly coordinated the shipment of large loads of cocaine with BERNAL, TASCON and other Colombian and Mexican traffickers.

71. In a conversation intercepted on Marc 25, 1999, in BERNAL's office, BERNAL REBELLON and JAIRO SANCHEZ discussed the recent shipment of 8,671 kilograms of cocaine to Mexico, and that a portion of the cocaine had been provided by REBELLON. BERNAL discussed with REBELLON, in detail, the reasons the delivery of the cocaine shipment had been delayed and why the return of REBELLON's drug proceeds were past due.

72. In a conversation intercepted on June 2, 1999, in BERNAL's office, BERNAL discussed with REBELLON the shipment of 5 tons of cocaine and the investment of $7,000,000 in order to obtain an additional 4.5 tons of cocaine for shipment.

73. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL and REBELLON talked in detail, with TASCON, concerning the coordination of a planned shipment of 15 tons of cocaine. They also discussed in detail the cost of the shipment of the 15 tons and BERNAL's arrangement with ARMANDO VALENCIA to accept delivery of the cocaine in Mexico.

74. In a conversation intercepted on June 29, 1999, in BERNAL's office, BERNAL and VILLAFANE discussed that BERNAL is presently coordinating a shipment of cocaine with REBELLON. BERNAL told VILLAFANE that they would be sending 2,000 kilograms of cocaine with REBELLON and the cost of the cocaine was $4,000,000.

75. **CARLOS ALBERTO JARAMILLO** – The evidenced obtained in this investigation

29

revealed that CARLOS JARAMILLO was a close associate of BERNAL's and FABIO

OCHOA's. JARAMILLO's paramour is OCHOA's niece and they have a child together. After

the attempted assassination of JARAMILLO in 1998, he and his girlfriend relocated to the Fort

Lauderdale, Florida area and resided in a condominium owned by BERNAL's wife. They resided

there until shortly before the birth of their child and then moved to the Aventura area of Dade

County, Florida. On December 18, 1998, DEA in Fort Lauderdale executed a judicially

authorized covert entry search of JARAMILLO's computer in the Aventura residence. The

search revealed the organization's use of Internet based communications facilities such as

electronic mail and Net Phone. Shortly after the birth of his child, JARAMILLO returned to

Colombia. BERNAL's office was placed in JARAMILLO's name and he shared office space with

BERNAL. His primary role in the organization, upon his return to Colombia in December, 1998,

was to facilitate the laundering of BERNAL's drug money.

76. In a conversation intercepted on May 3, 1999, in BERNAL's office, BERNAL and

JARAMILLO discussed BERNAL's proposed new route to transport cocaine with REBELLON

and TASCON and the costs associated with this new cocaine transportation route.

77. In a conversation intercepted on May 4, 1999, in BERNAL's office, BERNAL

discussed with JARAMILLO the exchange of real estate located in the Llanos of Colombia with

JARAMILLO.

78. In a conversation intercepted on May 13, 1999, in BERNAL's office, JARAMILLO

proposed the use of a new drug transportation route to Mexico utilizing a boat to transport the

cocaine. BERNAL advised JARAMILLO regarding what BERNAL perceived to be the risks

involved with the new route.

30

79. In a conversation intercepted on May 31, 1999, in BERNAL's office, BERNAL told JARAMILLO that ARMANDO VALENCIA had sent $2,000,000 to BERNAL from Mexico through MORENO.

80. In a conversation intercepted on June 29, 1999, in BERNAL's office, BERNAL discussed a recent drug transaction in New York in which $1,200,000 in drug proceeds were to be transported to Colombia and from that total BERNAL instructed that $300,000 be paid to VILLAFANE, $250,000 to CARLOS JARAMILLO and $650,000 to defendant OSCAR CAMPUZANO.

81. **HERMIS de JESUS BETANCOURT RIOS, a/k/a "SAULO,"** – The evidence obtained in this investigation revealed that BETANCOURT is among BERNAL's most trusted associates and that he spent much of his time in Mexico coordinating the transportation of the organizations' cocaine in that country and the logistics of getting the enormous amounts of proceeds back to BERNAL. He was actively involved in the Mimos route, as evidenced by several conversations between him and defendant EDWIN GONZALEZ ARBELAEZ, the manager of INALFRUIT in Colombia. BETANCOURT was also sent to Mexico to assist WALTER SEPULVEDA set up computers for the organization in that location.

82. In a conversation intercepted on March, 12, 1999, in Bernal's office, BETANCOURT was present in the office when HECTOR LONDONO discussed the transportation of 2,500 kilograms of cocaine that was to be shipped in the near future.

83. In a conversation intercepted on March 12, 1999, in BERNAL's office, BETANCOURT discussed the coordinates for the transfer of cocaine at sea and specifically noted that he was sending instructions to the captains of vessels regarding the coordinates via the

31

Internet.

84. As noted above in the NUBIA summary, BETANCOURT was sent by BERNAL to get Luis Murcia Sierra, a/k/a "Lucho," formerly the head of the Bogota Cartel, to pay BERNAL a prior drug debt.

85. **JORGE MAURICIO SANCHEZ VIDAL, a/k/a "MAO,"** – The evidence obtained in this investigation revealed that JORGE MAURICIO SANCHEZ VIDAL was one of BERNAL's coordinators for money laundering and drug trafficking activities in Mexico and Colombia. He is the brother of defendants JAIRO SANCHEZ CRISTANCHO and ORLANDO SANCHEZ CRISTANCHO.

86. In a conversation intercepted on March 2, 1999, in BERNAL's office, BERNAL, GOMEZ, and MORENO discussed the fact that SANCHEZ VIDAL was responsible for the transportation of the drug proceeds from Mexico to Colombia, and in particular he was responsible for arranging the repatriation of the proceeds of the 8,671 kilograms of cocaine that had recently been delivered to VALENCIA and which are discussed above.

87. In a conversation intercepted on March 23, 1999, in BERNAL's office, in Colombia, BERNAL and defendant MARIO ASTAIZA discussed the details of ASTAIZA's own drug trafficking network. They also discussed ASTAIZA's independent trafficking connections with VALENCIA and defendant DARIO ECHEVERRY and the fact that SANCHEZ VIDAL had done well in returning the proceeds of the 8,671 kilograms of cocaine, from Mexico to Colombia.

88. In a conversation intercepted on March 26, 1999, in BERNAL's office, BERNAL and SANCHEZ VIDAL discussed the fact that BERNAL was in possession of some of REBELLON's money in Cali.

89. In a conversation intercepted on April 22, 1999, in BERNAL's office, BERNAL and an unindicted co-conspirator discussed organizing a shipment of cocaine from Colombia to Mexico. BERNAL said that SANCHEZ VIDAL would be responsible for returning the money to Colombia from Mexico once the drugs were sold.

90. **JOSE WALTER SEPULVEDA RIOS, a/k/a "EL APA,"** – The evidence gather in this investigation revealed that SEPULVEDA was based in Mexico and assisted BERNAL in the coordination of BERNAL's drug trafficking and money activities in Mexico. SEPULVEDA resides in Guadalajara, Mexico, and met BERNAL when they were both incarcerated together in prison in Mexico on drug trafficking charges. SEPULVEDA was closely tied to BERNAL associates ALBERTO GALLEGO, GUILLERMO MORENO, MARIO ASTAIZA and ARMANDO VALENCIA.

91. In a conversation intercepted on March 9, 1999, in BERNAL's office, BETANCOURT told BERNAL the details of SEPULVEDA's recent activities in Mexico, on behalf of BERNAL, and that SEPULVEDA was attempting to arrange transportation for 2,000 kilograms of cocaine from Colombia to Mexico.

92. In a conversation intercepted on March 25, 1999, in BERNAL's office, BERNAL and JAIRO SANCHEZ CRISTANCHO discussed the fact that JAIRO SANCHEZ was actively negotiating a new drug route with a Mexican trafficking organization and that SEPULVEDA was coordinating the negotiations in Mexico.

93. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL and SEPULVEDA discussed the fact that BERNAL had full confidence in SEPULVEDA to handle BERNAL's drug trafficking activities in Mexico. SEPULVEDA explained to BERNAL and

33

others who were present that his role in Mexico was as a BERNAL's representative to VALENCIA and members of his, VALENCIA's, organization.

94.  **ADRIANA MARCELA VACCA BOJACA** – the evidence obtained in the investigation revealed that VACCA was BERNAL's personal secretary and is intimately involved in the day to day operations of BERNAL's drug a... money laundering activities.  She was intercepted regularly from the office and telephone intercepts.  She assisted the organization and BERNAL providing information to other organization members.  She has been intercepted providing information relating to U.S. bank accounts which have been used to facilitate the organizations' illegal activities.  BERNAL gave VACCA a condominium in Bogota.

95.  In an intercepted telephone conversation which took place on March 13, 1999, from one of the telephone lines in BERNAL's office, an unidentified female known only as "Olga" spoke to VACCA.  During the conversation Olga asks VACCA to transfer money to a bank accounts in the name of GALLEGO and NUBIA.

96.  On May 4, 1999, a telephone conversation was intercepted from one of the telephone lines located in BERNAL's office, between VACCA and CARLOS SANCHEZ , in Miami, Florida.  SANCHEZ provided VACCA with Miami bank account information to wire transfer money to an account in Miami, per VACCA's request.  The investigation revealed that SANCHEZ provided various services to BERNAL's operation in Colombia including the purchase of secure telephones, as well as the computer which was the subject of the search at JARAMILLO's residence in December, 1998.

97.  In a telephone conversation intercepted on May 7, 1999, from one of the telephone lines located in BERNAL's office, VACCA is recorded making the travel arrangements for

34

BERNAL to travel to Cuba. The purpose of BERNAL's travel was to meet VALENCIA and MORENO to coordinate BERNAL and VALENCIA's drug trafficking activities. As noted above, the evidence has not revealed any involvement of Cuban officials in this meeting.

98. In a conversation intercepted on May 10, 1999, in BERNAL's office, BERNAL discussed that he had given an apartment in Bogota to VACCA which was valued at 75 million Colombian pesos.

99. **MAURICIO MEJIA TORO, a/k/a "SUCHI," a/k/a "MOTOROLA,"** – The evidence in this investigation revealed that MEJIA was BERNAL's source for secure communications and provided advice to BERNAL and other organization members on how to engage in communications over cloned cellular telephones to evade law enforcement detection.

100. In a conversation intercepted on July 8, 1999, in BERNAL's office, MEJIA explained to BERNAL how the telephone cloning equipment MEJIA provided to BERNAL operated. MEJIA explained how to clone cellular phones and how to maintain secure communications during drug trafficking negotiations.

101. In a conversation intercepted on July 12, 1999, in BERNAL's office, MEJIA told BERNAL that they had previously provided technical equipment to the Cali drug cartel to allow for secure telephone communications.

102. In a conversation intercepted on August 3, 1999, in BERNAL's office, BERNAL asked MEJIA for another cellular cloning device for the use of BERNAL's workers and associates in Mexico.

103. **FREDDY IVAN OCHOA MEJIA, a/k/a "ANDRES"** – The evidence obtained in this investigation revealed that FREDDY IVAN OCHOA MEJIA was a Medellin based cocaine

35

trafficker who regularly met with BERNAL in his office in Bogota. OCHOA MEJIA coordinated money and drug shipments through his contacts and those of FABIO OCHOA. He was an active participant with BERNAL and GALLEGO in conversations regarding the coordination of the use of the clandestine airstrip offered to BERNAL by VANOY.

104.  In a conversation intercepted on June 29, 1999, in BERNAL's office, OCHOA MEJIA discussed the details of the movement of BERNAL's drug proceeds from Mexico to Colombia with BERNAL.

105.  In a conversation intercepted on July 7, 1999, in BERNAL's office, BERNAL, OCHOA MEJIA and GALLEGO discussed the use of VANOY's clandestine airstrip in Caucasia, Colombia to receive BERNAL's drug proceeds from Mexico. OCHOA MEJIA told BERNAL he had talked to VANOY regarding the use of the airstrip .

106.  In a conversation intercepted on July 9, 1999, in BERNAL's office, OCHOA MEJIA and BERNAL discussed the details of a planned shipment of a multi-ton quantity of cocaine to Mexico for subsequent importation into the United States, and the costs associated with the shipment.

In this same conversation, BERNAL gave instructions to OCHOA MEJIA about how BERNAL wanted OCHOA MEJIA to coordinate the return of the drug proceeds resulting from the multi-ton cocaine load.  BERNAL and OCHOA MEJIA also discussed, in detail, the coordination of a several planned shipments of multi-ton amounts of cocaine with HECTOR LONDONO, LUIS REBELLON, OSCAR CAMPUZANO, and CARLOS JARAMILLO – each of which loads were to be directed to VALENCIA in Mexico.

107.  **ALFREDO TASCON AGUIRRE, a/k/a "ALFREDITO,"** – The evidence

obtained in this investigation revealed that TASCON was the leader of a Cali based cocaine trafficking organization and that TASCON regularly coordinated and cooperated with BERNAL in the transportation of multi-ton amounts of cocaine from Colombia. REBELLON was a close associate of TASCON's.

108. In a conversation intercepted on May 25, 1999, in BERNAL's office, BERNAL and JAIRO SANCHEZ CRISTANCHO discussed the plan to have JAIRO SANCHEZ launder $1,000,000 of TASCON's drug proceeds. BERNAL also told Sanchez that BERNAL had met with TASCON and REBELLON shortly before the intercepted conversation.

109. In a conversation intercepted on July 16, 1999, in BERNAL's office, BERNAL, TASCON and the other associates discussed the details of a coordination of the transportation of a planned 15,000 kilogram shipment from Colombia to VALENCIA in Mexico.

110. In a conversation intercepted on June 29 , 1999, in BERNAL's office, BERNAL and TASCON discussed the transportation to Mexico of a multi-ton quantity of cocaine utilizing boats controlled by TASCON and REBELLON.

111. In a conversation intercepted on July 28, 1999, in BERNAL's office, BERNAL and TASCON discussed the status of a pending multi-ton shipment of cocaine and the need to complete the repatriation of $30,000,000 in drug proceeds to Colombia from Mexico.

112. **JAVIER LINDO, a/k/a "EL GORDO,"** - The evidence obtained in this investigation revealed that LINDO was the head of drug trafficking and money laundering organization based in Cali. LINDO's organization regularly coordinated drug trafficking and money laundering activities with BERNAL. LINDO worked closely with BERNAL associates REBELLON and TASCON.

37

113. In a conversation intercepted on March 2, 1999, in BERNAL's office, REBELLON informed BERNAL that at that time he was working with LINDO on a scheme to transport 4 tons of cocaine from Colombia to Mexico.

114. In a conversation intercepted on May 13, 1999, in BERNAL's office, VILLAFANE told BERNAL that LINDO did not agree with the percentage charged by BERNAL for the shipment of cocaine to Mexico. VILLAFANE told BERNAL that if he reduced the percentage LINDO would provide 3 tons of cocaine to BERNAL for shipment. BERNAL instructed VILLAFANE to tell LINDO to prepare the cocaine for shipment.

115. In a conversation intercepted on June 2 , 1999, in BERNAL's office, REBELLON told BERNAL that LINDO was involved in the shipment of 10 tons of cocaine and that LINDO had a boat which, at the time, was ready to transport the cocaine. REBELLON and LINDO discussed the fact that LINDO was in contact with a Mexican trafficker to coordinate the transportation of the 10 tons of cocaine.

116. In a conversation intercepted on June 16, 1999, in BERNAL's office, REBELLON told BERNAL that LINDO was involved in the shipment of 15 tons of cocaine. REBELLON informed BERNAL that the plan was to transport the cocaine on a vessel controlled by LINDO.

117. In a conversation intercepted on August 18, 1999, in BERNAL's office, BERNAL, LINDO, REBELLON and VILLAFANE discussed the need to coordinate upcoming cocaine shipments.

118. **DARIO ECHEVERRY** – The evidence obtained in this investigation revealed that ECHEVERRY was the head of a Tumaco-based transportation organization. He is associated with major drug traffickers, including Diego Montoya, Nelson Urrego and defendant EVER

38

VILLAFANE MARTINEZ. Members of BERNAL's organization or their associates used ECHEVERRY's ships and the Port of Tumaco as a primary route for the shipment of cocaine into the United States through Mexico. His role is corroborated by conversations intercepted in BERNAL's office on March 23 and June 29, 1999, during which BERNAL, Mario ASTAIZA and VILLAFANE discuss details of using ECHEVERRY's boats and making arrangements with the manager at the Port of Tumaco to send a shipment of cocaine.

119. In a conversation intercepted on March 23, in BERNAL's office, BERNAL, ASTAIZA, and VILLAFANE discussed how ECHEVERRY controlled the Port of Tumaco by having the individuals in charge of the port and law enforcement at the port on his payroll. VILLAFANE said that he had seen ECHEVERRY in Tumaco and that ECHEVERRY's boats were impressive and had the ability to conceal 12 tons of cocaine per shipment.

120. In a conversation intercepted on June 29, 1999, in BERNAL's office, VILLAFANE stated that ECHEVERRY called to offer his boats to transport cocaine. ECHEVERRY told VILLAFANE that his boats were ready and waiting to send the next narcotic shipment. VILLAFANE said that ECHEVERRY was one of the two transportation groups he had worked with who rarely lost a load of cocaine.

121. **EVER VILLAFANE MARTINEZ, a/k/a "JUANCHO,"** – The evidence obtained in this investigation revealed that VILLAFANE was the leader of a cocaine trafficking organization based in Cali, and that VILLAFANE regularly coordinated the shipment of multi-ton amounts of cocaine with BERNAL.

122. In a conversation intercepted on March 23, 1999, in BERNAL's office, VILLAFANE was present and engaged in a discussion with BERNAL and MARIO ASTAIZA

39

and talked to BERNAL about the movement of loads of cocaine from Colombia to VALENCIA in Mexico. They also discuss the method through which the money was returned to Colombia. The return of the money was handled by JORGE MAURICIO SANCHEZ VIDAL.

123. In a conversation intercepted on March 23, 1999, in BERNAL's office, BERNAL, VILLAFANE and ASTAIZA met and discussed the transportation of several cocaine loads from Colombia to Mexico. They also discussed the details of the return of stockpiled drug proceeds that needed to be transported from Mexico to VILLAFANE in Colombia. It was decided that the transportation of the drug proceeds will be handled by SANCHEZ VIDAL.

124. In a conversation intercepted on May 13, 1999, in BERNAL's office, BERNAL and VILLAFANE discussed the return of certain drug proceeds to Colombia and commented that half the proceeds would be returning from New York and the other half from Mexico.

125. In a conversation intercepted on June 29 , 1999, in BERNAL's office, VILLAFANE told BERNAL about a recent contact he had with DARIO ECHEVERRY and that VILLAFANE and ECHEVERRY planned to use ECHEVERRY's ships to transport cocaine.

During the same conversation, BERNAL told VILLAFANE that $1,200,000 in drug proceeds from New York would be divided by paying $300,000 to VILLAFANE, $250,00 to JARAMILLO  and $650,000 to CAMPUZANO.

126. **MARIO ASTAIZA ARIAS, a/k/a "EL MARCIANO"** – The evidence obtained in this investigation revealed that ASTAIZA was the head of a Cali based cocaine trafficking organization who coordinated shipments of cocaine to Mexico in cooperation and coordination with BERNAL.  ASTAIZA also transported cocaine loads from Colombia, directly to ARMANDO VALENCIA in Mexico.

40

127. In a conversation intercepted on March 23, 1999, in BERNAL's office, BERNAL, VILLAFANE and ASTAIZA discussed the transportation of several loads of cocaine from Colombia to VALENCIA.

128. In a conversation intercepted on May 13, 1999, in BERNAL's office, BERNAL and VILLAFANE discussed the progress of a multi-ton shipment of cocaine that VILLAFANE was conducting with ASTAIZA and that ASTAIZA had received 340 kilograms of cocaine from JAIRO SANCHEZ CRISTANCHO along with drug proceeds from a previous 2 ton shipment of cocaine.

129. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL told those present that he had introduced ASTAIZA to the late Mexican trafficker Amado Carrillo Fuentes and that ASTAIZA was a close associate of Mexican drug trafficker "Beto Albino."

130. **CARLOS ALONSO CARDENAS, a/k/a "CALICHE"** – The evidence gathered in this investigation revealed that CARDENAS was in Cali, and was associated with several drug-traffickers, primarily VILLAFANE. His role with VILLAFANE was to coordinate VILLAFANE's cocaine shipment arrangements with BERNAL. He has been present in BERNAL's office on several occasions and discussed the details of VILLAFANE's shipments, as well as the return of drug proceeds through the United States and Mexico, and the transportation of cocaine within the country of Colombia to its point of departure. CARDENAS was actively involved in the "Mimos" route, in which DEA seized 740 kilograms of cocaine hidden in frozen fruit pulp on August 30, 1999. There were also numerous surveillances and electronic intercepts connecting CARDENAS to other members of the organization.

131. In a conversation intercepted on March 2, 1999, in BERNAL's office, BERNAL and

41

GOMEZ, discussed how GOMEZ would be responsible for coordinating the safe return of drug proceeds belonging to VILLAFANE from Mexico to Colombia. They agreed that the proceeds would then be turned over to CARDENAS, in Colombia.

132. In a conversation intercepted on March 29, 1999, in BERNAL's office, BERNAL explained to CARDENAS that of the total amount of drug proceeds CARDENAS had just returned to Colombia, that the value of 1,300 kilograms of cocaine in dollars was owed to ASTAIZA, and the rest of the money was BERNAL's. Later in this conversation, they discussed CARDENAS's assistance to BERNAL in obtaining a false passport from CARDENAS's contacts in Cali, Colombia. When BERNAL attempted to leave Colombia using the false passport CARDENAS supplied, BERNAL's departure was prevented by Colombian officials, who did not accept the passport as valid.

133. **BERNARDO ALBERTO SANCHEZ NORENA, a/k/a "DON BERNARDO"** -

The evidence obtained in this investigation revealed SANCHEZ was the leader of one of the largest Medellin-based trafficking organizations. He met regularly with BERNAL in his office, and has been photographed utilizing BERNAL's cellular telephone cloning equipment in the window of the office. SANCHEZ had established drug-trafficking routes through the Colombian ports at Tumaco and Buenaventura as well as through Ecuador, Panama and Guatemala. SANCHEZ was reported to be connected to Carlos Castano, the leader of the right wing Paramilitary organization to which defendant VANOY belongs. SANCHEZ shipped cocaine using the "Cloros" route (also referred to in some instances as "La Gorda"), which entailed secreting multi-thousand kilogram amounts of cocaine in shipments of chlorine cylinders.

134. In a conversation intercepted on March 2, 1999, in BERNAL's office, BERNAL and

JARAMILLO, discussed how SANCHEZ was responsible for coordinating all of the narcotic shipments of defendants CAMPUZANO and USUGA NORENA.  In addition, SANCHEZ discussed his practice of turning over the narcotics to defendant MESA SANIN.  Later in the same conversation, JARAMILLO explained to BERNAL how he sent a narcotic shipment through Houston, Texas, and on into New York, N.Y., which belonged to SANCHEZ, CAMPUZANO and USUGA.

135.  In a conversation intercepted on April 28, 1999, in BERNAL's office, BERNAL explained that an unindicted co-conspirator from Cali, Colombia, had participated in a narcotics shipment with SANCHEZ and that the unindicted co-conspirator was going to meet with SANCHEZ to coordinate additional narcotic shipments with him.

136.  In a conversation intercepted on May 3, 1999, in BERNAL's office, BERNAL, SANCHEZ, and JAIRO SANCHEZ CRISTANCHO discussed how SANCHEZ had worked with VALENCIA in Mexico.  SANCHEZ explained that most of their cargo from Mexico was entering the United States at Long Beach, California.  They discussed the method of concealing cocaine in Medellin (in heavy machinery), which afforded them the ability to conceal approximately 5,000 kilograms per shipment.  BERNAL offered to use his connections with VALENCIA in Mexico to ship SANCHEZ's cocaine.

137.  In a conversation intercepted on August 20, 1999, in BERNAL's office, BERNAL discussed with MORENO, that SANCHEZ was very worried about the August, 1999, seizure of 3,438 kilograms of cocaine from the chlorine cylinders in Quito, Ecuador.  BERNAL said that SANCHEZ was going to change the name of his company in Medellin.

138.  In a conversation intercepted on October 5, 1999, in BERNAL's office, SANCHEZ

43

discussed the Quito seizure with BERNAL, referring to the route on this occasion as "La Gorda." SANCHEZ noted that he had used the route for 2 years, and has sent cocaine using 5 countries: Ecuador, Guatemala, Spain, Chile, and Colombia.

139. **HECTOR MARIO LONDONO VASQUEZ, a/k/a "EL NEGRO,"** – The evidence obtained in the investigation revealed tha LONDONO coordinated the "Mimos" and "La Flaca" drug shipment routes for BERNAL from Medellin. LONDONO regularly visited BERNAL's office to discuss the coordination of drug shipments.

140. In a conversation intercepted on March 12, 1999, in BERNAL's office, BERNAL and BETANCOURT discussed the fact that LONDONO was coordinating the shipment of cocaine utilizing the "La Flaca" drug route.

141. In a conversation intercepted on April 15, 1999, in BERNAL's office, BERNAL and LONDONO discussed a plan to route drug shipments through Chile. LONDONO commented that he knew a person in Panama that could assist in the transportation of cocaine loads through Panama in shipping containers and that this person could also coordinate BERNAL's shipments of cocaine to Europe.

142. In this same conversation, BERNAL and LONDONO discussed the fact that there were 2,000 kilograms of cocaine in Brazil that were ready for shipment at the time of the conversation.

143. In a conversation intercepted on April 28, 1999, in BERNAL's office, BERNAL and LONDONO discussed the fact that it was a mistake to use the Port of Cartagena, Colombia, to ship the "Mimos" drug shipment because a load had almost been seized from there. Investigators believe that this discussion referred to the narrow miss BERNAL experienced when the Bahamian

44

authorities did not locate the cocaine during their search in Freeport.

144. In this same conversation, LONDONO discussed the fact that a Mexican trafficker, "El Guerro," had a drug route utilizing boats and that the BERNAL organization could utilize those boats to ship 6,000 kilograms of cocaine, 2,000 kilograms per boat load.

145. **OSCAR EDUARDO CAMPUZANO ZAPATA, a/k/a "EL FLACO"** – The evidence obtained in this investigation revealed that CAMPUZANO was the leader of a Medellin based trafficking organization who utilized BERNAL's organization and routes to ship cocaine to Mexico. CAMPUZANO owned at least part of the Mimos load which was not discovered during the search in Freeport on April 12, 1999. CAMPUZANO had his own routes and supplied BERNAL with cocaine as well as sharing space with BERNAL in loads he was putting together for transport.  CAMPUZANO worked with defendants JUAN GABRIEL USUGA NORENA, and BERNARDO SANCHEZ NORENA, in the narcotic business.

146. In a conversation intercepted on March 2, 1999, in BERNAL's office, BERNAL told JARAMILLO that there were drug proceeds that needed to be transported from Mexico to Colombia.  BERNAL told JARAMILLO that BERNARDO  SANCHEZ was managing and coordinating narcotic shipments for CAMPUZANO and USUGA NORENA.

147. In a conversation intercepted on March 29, 1999, in BERNAL's office, BERNAL told defendant CARLOS CARDENAS that BERNAL was waiting for a telephone call from CAMPUZANO to confirm whether CAMPUZANO could assist BERNAL in bringing $1,500,000 in drug proceeds from Mexico to Colombia.

148. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL and others discussed the fact that CAMPUZANO owned at least part of the "Mimos" load that was

45

unsuccessfully searched in Freeport, Bahamas in April, 1999. We know from later intercepted conversations that this shipment of frozen fruit pulp contained approximately 600 kilograms of cocaine.

149. In a conversation intercepted on August 20, 1999, in BERNAL's office, BERNAL and JAIME CASTIBLANCO CABALCANTE discussed the mid-August, 1999, seizure of 3,538 kilograms of cocaine in Quito, Ecuador. BERNAL and CASTIBLANCO discussed the fact that the load had been coordinated by BERNARD SANCHEZ and was owned by CAMPUZANO and USUGA NORENA.

150. **RICARDO PASTOR OCHOA RUIZ, a/k/a "CAMILO,"** – The evidence obtained in this investigation revealed that OCHOA RUIZ was a close associate of BERNAL's and was responsible for coordinating the shipment of cocaine for BERNAL. OCHOA RUIZ accomplished this through his association with " Groupo Arcadia," which is located in Medellin. Groupo Arcadia was comprised essentially of front companies used by BERNAL to facilitate narcotics shipments and money laundering. Among these front companies used to transport cocaine was INALFRUIT, a Medellin, Colombia, based company. OCHOA RUIZ regularly coordinated with INALFRUIT personnel for the transportation of cocaine loads through the "Mimos" drug route. The Colombian National Police have conducted surveillance of OCHOA RUIZ, on several occasions in Medellin, and have observed OCHOA RUIZ meeting with Edwin Gonzalez at INALFRUIT.

151. In a conversation intercepted on April 28, 1999, in BERNAL's office, BERNAL and JAIRO SANCHEZ CRISTANCHO discussed drug money accounts and BERNAL instructed JAIRO SANCHEZ to verify the amounts in the accounts with OCHOA RUIZ who maintained

46

the records in his computer.

152. In a conversation intercepted on June 2 , 1999, in BERNAL's office, BERNAL and OCHOA RUIZ discussed different drug trafficking routes and finances associated with these routes.

153. In a conversation intercepted on June 16, 1999, in BERNAL's office, BERNAL, OCHOA RUIZ, and LONDONO, discussed  a drug trafficking route to transport cocaine loads in association with REBELLON.

154. **EDWIN GONZALEZ ARBELAEZ, a/k/a "EDWIN GONZALEZ," a/k/a JUAN GUILLERMO ARBELAEZ DIAZ"** – The evidence in this investigation revealed that GONZALEZ ARBELAEZ was a manger at INALFRUIT, a front company in Medellin used to facilitate the "Mimos" route.  Included in the evidence developed in this case are surveillance photographs showing OCHOA RUIZ visiting INALFRUIT, corroborating intercepted telephone conversations wherein GONZALEZ ARBELAEZ discussed the Mimos route and the use of INALFRUIT to facilitate the shipments of drugs sent for the organization.

155. On August 16, 1999, a "Mimos" narcotic shipment departed from Cartagena, Colombia.  On August 30, 1999, 740 kilograms of cocaine which had been secreted in frozen fruit pulp, was seized at the Port of Houston, Texas by United States Customs officials working in conjunction with DEA.  GONZALEZ ARBELAEZ was directly responsible for the packaging and transportation of this cocaine.  His participation was confirmed by law enforcement surveillances and telephonic intercepts, wherein GONZALEZ ARBELAEZ was intercepted coordinating the transportation of the cargo to Mexico.

156. In telephone conversations intercepted on July 28, and July 30, 1999,  GONZALEZ

47

ARBELAEZ spoke to BETANCOURT. BETANCOURT, who was in Mexico awaiting cocaine shipments, discussed with GONZALEZ ARBELAEZ the details of the planned shipments of cocaine. It is believed, based on the context and time of these interceptions, that the planned shipments discussed by the defendants in this conversation included the shipment that was ultimately seized in Houston, Texas.

157. In an intercepted telephone conversation which took place on August 6, 1999, GONZALEZ ARBELAEZ received instructions from OCHOA RUIZ to make payments related to the departure of the seized "Mimos" load from Cartagena.

158. At the time of his arrest in Colombia on October 13, 1999, GONZALEZ ARBELAEZ had identification in his possession in the name of Juan Guillermo Arbelaez Diaz.

159. **SANTIAGO VELEZ-VELAZQUEZ, a/k/a "NEGRO VELEZ"-** The evidence obtained in this investigation revealed that VELEZ was OCHOA's right-hand man. VELEZ acted as OCHOA's representative to BERNAL, coordinating OCHOA's narcotic shipments and subsequent laundering of the narcotic proceeds. On one occasion, VELEZ and OCHOA arrived together to meet BERNAL at his office. OCHOA specifically vouched that VELEZ was his representative to BERNAL. After that meeting, VELEZ met with BERNAL on numerous occasions in BERNAL's office, and discussed with BERNAL and other members of the organization the coordination of various shipments of narcotics and the handling of the illicit financial proceeds.

160. In a conversation intercepted on July 8, 1999, in BERNAL's office, VELEZ discussed the arrest of 11 people in Barranquilla and Medellin with BERNAL, and LONDONO. They discussed the need to supply one of the arrestees with legal representation to protect their

48

interests, because of her association and knowledge of their organization. I believe this conversation to be a reference to "Operation Trans Atlantico," in which 11 defendants were arrested in Barranquilla and Medellin pursuant to provisional arrest requests filed by the United States.

161. In a conversation intercepted on July `3, 1999, in BERNAL's office, VELEZ told BERNAL and OCHOA MEJIA that they had a narcotics shipment ready for transport. The shipment had been arranged for CASTIBLANCO. The participants discussed that VALENCIA had to deliver some money prior to the cocaine being transported. They also commented that Ramiro VANOY, would take part in the operation with 6 tons of his own cocaine.

162. In a conversation intercepted on August 18, 1999, in BERNAL's office, VELEZ talked with BERNAL and VILLAFANE about financial account information. BERNAL was unhappy with VELEZ, because BERNAL believed VELEZ was being dishonest. BERNAL instructed that VELEZ and VILLAFANE meet to resolve the underlying agreement of the amounts of drug proceeds that were outstanding.

163. **MARIO GERMAN LOPEZ CARDONA, a/k/a/ "PEDRO"**- The evidence obtained in this investigation revealed that LOPEZ CARDONA was a drug-trafficking associate of REBELLON in Cali, Colombia. LOPEZ CARDONA was REBELLON's right hand man, and coordinated REBELLON's narcotic shipments and the return of the illegal proceeds. LOPEZ CARDONA was also directly involved in the shipment of 8,671 kilograms of cocaine which was sent to Mexico in March 1999.

164. In a conversation intercepted on March 2, 1999, in BERNAL's office, LOPEZ CARDONA told BERNAL that he had not been able to meet with GALLEGO in Cali, Colombia

because GALLEGO had been too busy with a drug shipment that had just departed Colombia.

165. In a conversation intercepted on March 12, 1999, in BERNAL's office, LOPEZ CARDONA, BERNAL, BETANCOURT, REBELLON, and JAIRO SANCHEZ discussed a plan to ship cocaine to VALENCIA in Mexico via airplane.  REBELLON discussed his possession of 2,500 kilograms of cocaine.  BETANCOURT mentioned that REBELLON needed to coordinate with LOPEZ CARDONA for the directions for the flight.

166. In a conversation intercepted on June 16, 1999, in BERNAL's office, REBELLON stated LOPEZ CARDONA owned 500 kilograms of a 5 ton cocaine shipment that REBELLON had completed.

167. In a conversation intercepted on June 29, 1999, in BERNAL's office, OCHOA MEJIA talked to BERNAL about how certain drug proceeds were being returned to Colombia. Once the money was in Colombia and had been unloaded , OCHOA MEJIA planned to transport the money via helicopter and turn it over to LOPEZ CARDONA.

168. In a conversation intercepted on July 9, 1999, in BERNAL's office, LOPEZ CARDONA told BERNAL and OCHOA MEJIA that there would be two flights containing a total of 34 tons of cocaine.  One flight would be arranged by REBELLON,  who would contact only LOPEZ CARDONA.  Each flight would be referred to as an "office," and LOPEZ CARDONA would be referred to as REBELLON's "secretary."

169. **SERGIO PERDOMO LIEVANO**- The evidence in this investigation revealed that PERDOMO LIEVANO was a major narcotics trafficker with his own organization, as well as being a drug-trafficking associate of BERNAL.

170. In a conversation intercepted on August 18, 1999, in BERNAL's office,

PERDOMO LIEVANO told BERNAL and CASTIBLANCO how he had coordinated the transportation of drugs. PERDOMO LIEVANO talked about 10,000 kilograms of cocaine transported between Guatemala and Mexico concealed in a cover load of bathroom materials. PERDOMO LIEVANO stated that he sent tractor trailers from Mexico to Panama to pick up narcotics, and that these tractor trailers then returned to Mexico loaded with the narcotics.

In the same conversation, PERDOMO LIEVANO talked about how he had other assets at his disposal. He stated that he communicated with the other major narcotics traffickers in Mexico over satellite telephones. He talked about how he used small aircraft to transport narcotics and drug proceeds between Colombia and Mexico, and used fast boats to transport narcotics. During the same conversation, he invited BERNAL to participate in a 1,000 kilogram cocaine shipment that PERDOMO LIEVANO was going to send to the Dominican Republic with CASTIBLANCO. PERDOMO LIEVANO also stated he sent cocaine through the Bahamas and on to Miami, Florida. He said that using this route he made a 75 percent profit once the cocaine was sold in Miami.

172. In a conversation intercepted on August 18, 1999, in BERNAL's office, PERDOMO LIEVANO told CASTIBLANCO and BERNAL that he would stop sending flights over the Pacific ocean because the "gringos," which I believe to be a reference to law enforcement in the United States, were there. Later PERDOMO LIEVANO stated that the "DEA" had the area controlled and therefore it was very risky to send narcotics via this route.

173. In a conversation intercepted on September 18, 1999, in BERNAL's office, BERNAL and PERDOMO LIEVANO spoke about a warning BERNAL received from an unindicted co-conspirator that the DEA was investigating BERNAL. PERDOMO LIEVANO

raised the question of whether BERNAL was being investigated by the DEA, or whether it was an extortion attempt. PERDOMO LIEVANO counseled BERNAL about the best way to determine if the Government of Colombia had an open investigation against BERNAL.

174. **JUAN GABRIEL USUGA NORENA, a/k/a "BIONICO," a/k/a "EL PIRATE"**- The evidence obtained in this investigation revealed that USUGA NORENA was a money laundering associate of CAMPUZANO. USUGA NORENA was intercepted discussing pending financial accounts of other organization members.

175. In a conversation intercepted on March 2, 1999, in BERNAL's office, BERNAL told JARAMILLO to facilitate the safe return of illicit proceeds from Mexico to Colombia. BERNAL also stated that BERNARDO SANCHEZ was currently managing and coordinating narcotic shipments for USUGA NORENA and CAMPUZANO. Telephone records confirmed that USUGA NORENA and SANCHEZ had been in contact with each other.

175. In a telephone conversation intercepted on March 12, 1999, between OCHOA MEJIA and USUGA NORENA, OCHOA MEJIA stated that he would bring USUGA NORENA a quantity of money to demonstrate the business ties between the two.

176. In a conversation intercepted on August 20, 1999, in BERNAL's office, BERNAL, LOPEZ MOLINA, and CASTIBLANCO discussed the 3,538 kilogram cocaine seizure which took place in Quito, Ecuador, in early August, 1999. It should be noted that in the conversation the participants refer to the route which was used as "La Gorda." This is the same route which was more often referred to as "Los Cloros." They confirmed that the narcotic shipment that was seized was coordinated by SANCHEZ and was owned by USUGA NORENA and CAMPUZANO.

177.   **HORACIO DE JESUS MORENO URIBE**- The evidence obtained in this investigation revealed that MORENO URIBE was a significant money launderer in the BERNAL drug trafficking organization.  MORENO URIBE arranged for the use of third party names and bank accounts to facilitate the transfer of drug money to and from Miami, Florida.  MORENO URIBE sent and received numerous faxes to money launderers working for BERNAL in Miami and New York.  These faxes consisted of bank transfers, including account numbers, quantities, and the names and Colombian Cedula numbers of the people to be used as the front persons on these accounts.

178.  In a telephone conversation intercepted on March 11, 1999, pursuant to judicial authorization received in the United States District Court in the Southern District of Florida, MORENO URIBE and Miami-based defendant CARLOS SANCHEZ, MORENO URIBE told SANCHEZ to contact him at the office because everything was ready.

179.  In a telephone conversation intercepted on March 29, 1999, MORENO URIBE and an unidentified individual in Miami, Florida, discussed problems with communications between Citibank and Union Bank.  The investigation has revealed that accounts at each of these financial institutions were used to launder BERNAL's drug proceeds.

180.  **CARLOS BARRERA, a/k/a "CARLOS DAVIS BARRERA GARCES" a/k/a "CALICHE," a/k/a "MARCOS"**- The evidence obtained in this investigation revealed that BARRERA was a Medellin-based money laundering associate of GOMEZ MORENO. BARRERA coordinated with OCHOA MEJIA for the transportation of monies from Mexico to the landing strip controlled by the Paramilitary in Caucasia, Colombia.

181.  In a conversation intercepted on April 22, 1999, in BERNAL's office, BERNAL,

53

and BARRERA, discussed the fact that BARRERA was responsible for picking up the drug proceeds when they land in Colombia. BARRERA would then deliver the proceeds to GOMEZ MORENO, who was responsible for exchanging the money from United States currency to Colombian Pesos. BARRERA discussed with BERNAL that by putting him in charge of the repatriation of the illicit proceeds, BERNAL was  'king away some of the responsibilities of GOMEZ MORENO. They discussed how GOMEZ MORENO was consuming too much alcohol, and that GOMEZ MORENO had problems with a recent pick up of $900,000 in drug proceeds in Medellin. BERNAL stated that he wanted BARRERA to start handling the proceeds because he was more trustworthy, and that BERNAL wanted to increase the quantity of narcotics he was sending to 15 to 20 tons of cocaine per shipment. BERNAL stressed the importance of processing the illicit proceeds as quickly as possible, in order to lessen the time between when the narcotics were initially sent, and when the proceeds became available to use to buy more drugs for the next shipment. They discussed the fact that the sooner they received the proceeds, the more narcotic shipments they could make, therefore making their narcotics business more profitable.

182. In the same conversation, BARRERA and BERNAL discussed how BARRERA had his own contacts who were sending drug shipments to Mexico, and he offered BERNAL the opportunity to use these routes. The routes that BARRERA offered BERNAL went through the Port of Tumaco, Colombia, and through Venezuela, using "mules," that is, people who carry the narcotics. BARRERA stated he had everything, including the "mules," and had the capability to send between 1,000 to 4,000 kilograms of cocaine at a time to Mexico. BARRERA stated that he had secret compartments capable of holding up to 1,000 kilograms each.

183. In a conversation intercepted on June 1, 1999, in BERNAL's office, VANOY told

BERNAL that he had an associate who had money that needed to be transported to Colombia. BERNAL gave VANOY BARRERA's cellular telephone number, and told VANOY that BARRERA would assist VANOY in having the dollars brought to Colombia.

184. **CARLOS MARIO LOPEZ MOLINA, a/k/a "CARLOS MARIO LONDONO BOTERO"**- The evidence obtained in the investigation revealed that LOPEZ MOLINA was a pilot and partner of ESQUIVIA SOTELO. They made numerous flights, transporting tons of both narcotics and the illegal proceeds, throughout Central and South America.

185. In a conversation intercepted on August 3, 1999, in BERNAL's office, LOPEZ MOLINA and BERNAL discussed how LOPEZ MOLINA would transport drug proceeds from Mexico to Colombia, and would take 250 kilograms of cocaine up to Mexico, to pay the Mexicans who were safeguarding the proceeds in Mexico. In the same conversation, LOPEZ MOLINA and defendant ESQUIVIA SOTELO told BERNAL that they had transported drug money and narcotics for various members of BERNAL's organization, including ORLANDO SANCHEZ CRISTANCHO, and members of the Amado Carrillo Fuentes and Arellano Felix drug trafficking organizations. BERNAL told them that he was organizing 2 shipments of narcotics, one of 10 tons of cocaine, and another of 4 tons of cocaine. BERNAL told to ESQUIVIA SOTELO and LOPEZ MOLINA that they would be responsible for returning the proceeds from the 4 ton cocaine shipment from Mexico to Colombia. BERNAL told them that he currently had between $15,000,000 and $20,000,000 in Mexico waiting to be returned to Colombia.

ESQUIVIA SOTELO and LOPEZ MOLINA told BERNAL that they had a friend in Mexico who controlled a processing company that made bags to pack sugar. They offered BERNAL the use of these bags for packaging the proceeds, and offered to have them sent to

Colombia through the sugar company.

186. In a conversation intercepted on August 4, 1999, in BERNAL's office LOPEZ MOLINA told BERNAL that he had a plane capable of holding 300 kilograms, and offered BERNAL the use of this aircraft.

187. **OSCAR ALONSO GOMEZ MORENO** -The evidence obtained in this investigation revealed that GOMEZ MORENO was defendant HORACIO MORENO's right hand man. GOMEZ MORENO was the brother of HERNAN GOMEZ, another money launderer for the BERNAL organization. GOMEZ MORENO was in charge of contacting co-conspirators and businesses with regard to laundering the drug proceeds of the organization. As confirmed by numerous phone intercepts, GOMEZ MORENO was involved with the sending and receiving of faxes which provided the recipient with instructions for the laundering of the drug proceeds. GOMEZ MORENO was intercepted on other occasions engaging in coded conversations.

188. In a telephone conversation intercepted on March 8, 1999, GOMEZ MORENO told an unindicted coconspirator that he had left a check for him at the house and told the unidentified individual to him to pick up some "animals," and bring them to GOMEZ MORENO.

189. In a telephone conversation intercepted on March 29, 1999, an unindicted co-conspirator asked VACCA, BERNAL's secretary, for GOMEZ MORENO's bank account number. That same day, in another intercepted telephone conversation, GOMEZ-MORENO talked to an unidentified co-conspirator, about the loss of money in Miami, Florida, that they had sent through a Citibank account.

190. **FERNANDO ANTONIO ESQUIVIA SOTELO, a/k/a "NANDO," a/k/a**

56

**"CIRILO"**- The evidence obtained in this investigation revealed that ESQUIVIA SOTELO was a pilot who was in partnership with LOPEZ MOLINA. They made numerous flights transporting tons of both narcotics and the drug proceeds, throughout central and south America.

191. In a conversation intercepted on August 3, 1999, in BERNAL's office, LOPEZ MOLINA and BERNAL discussed how LOPEZ MOLINA, ESQUIVIA SOTELO's partner, would transport drug proceeds from Mexico to Colombia, and would take 250 kilograms of cocaine up to Mexico, to pay the Mexicans who were safeguarding the proceeds in Mexico. In the same conversation, LOPEZ MOLINA and defendant ESQUIVIA SOTELO told BERNAL that they had transported drug money and narcotics for various members of BERNAL's organization, including ORLANDO SANCHEZ CRISTANCHO, and members of the Amado Carrillo Fuentes and Arellano Felix drug trafficking organizations. BERNAL told them that he was organizing 2 shipments of narcotics, one of 10 tons of cocaine, and another of 4 tons of cocaine. BERNAL told ESQUIVIA SOTELO and LOPEZ MOLINA that they would be responsible for returning the proceeds from the 4 ton cocaine shipment from Mexico to Colombia. BERNAL told them that he currently had between $15,000,000 and $20,000,000 in Mexico waiting to be returned to Colombia.

ESQUIVIA SOTELO and LOPEZ MOLINA told BERNAL that they had a friend in Mexico who controlled a processing company that made bags to pack sugar. They offered BERNAL the use of these bags for packaging the proceeds, and offered to have them sent to Colombia through the sugar company.

192. In a conversation intercepted on August 4, 1999, in BERNAL's office LOPEZ MOLINA told BERNAL that he had a plane capable of holding 300 kilograms, and offered

57

BERNAL the use of this aircraft.

193.  **LUIS CARLOS ZULUAGA QUICENO, a/k/a "MARIO ANTONIO ARBOLEDA SALDARRIAGA"-** The evidence obtained in this investigation revealed that ZULUAGA was a close drug trafficking associate of BERNARDO SANCHEZ NORENA. ZULUAGA played a managerial role in the operation of SANCHEZ NORENA's "Cloros" (also known as "La Gorda") route, by directing and coordinating the daily movements of chlorine cylinders which concealed cocaine. The cocaine was secreted in chlorine cylinders at the "Cloros Industriales De Medellin," and then sent to the border town of Ipiales, Colombia, then onto a company known as Bulholsa S.A. in Quito, Ecuador. The cocaine filled cylinders were then sent through Guayaquil, Ecuador, to Guatemala, Chile, and Spain. Between August 13, 1999, and August 17, 1999, two seizures were made in Quito, Ecuador, which were directly controlled and monitored by ZULUAGA. These seizures, totaling 3,538 kilograms of cocaine, were controlled and owned by SANCHEZ NORENA, USUGA NORENA, and CAMPUZANO.

194. In a telephone conversation intercepted on June 21, 1999, an unidentified male told ZULUAGA that a container in Santo Domingo had been detained, and that they should discontinue any further activity until they could find out what had happened. I believe this is an example of how ZULUAGA tracked cocaine shipments, and then analyzed how and why law enforcement conducted searches.

195. In a telephone conversation intercepted on July 15, 1999, MESA SANIN and BERNARDO SANCHEZ discussed how their associates in Guatemala did not have money to get the chlorine cylinders through Guatemala Customs. SANCHEZ NORENA stated that ZULUAGA and another unindicted co-conspirator in Ecuador should have had sufficient funds to

get the cylinders released from customs, because SANCHEZ NORENA had been sending them money every two days. MESA SANIN repeated that ZULUAGA was angry because he claimed that he and the associate in Ecuador did not have sufficient funds. On July 28, 1999, the Guatemalan police searched 13 cylinders in Guatemala with negative results. These cylinders originated in Medellin at ZULUAGA's company ⁓loros Industriales De Medellin."

196. In a telephone conversation intercepted on July 30, 1999, ZULUAGA talked to an unindicted co-conspirator in Guatemala, and asked for the details of the search. ZULUAGA told him to stop further shipments until they found out the details how and why law enforcement conducted the search. ZULUAGA and his associate then formulated their own plan to discourage law enforcement from searching the cylinders in the future. They agreed to send a letter to the Guatemalan Government, warning of the health hazards and other physical dangers of searching chlorine containers without proper knowledge and equipment, to discourage searches of these containers. These interceptions, in conjunction with other investigative activity, resulted in the seizures of cocaine in Quito, Ecuador in August, 1999.

59

## CONCLUSION

197. I have attached a photograph of the defendants whose extradition is sought and identification information to this affidavit as EXHIBIT B. Photographs of the defendants were obtained from two sources. From official Colombian identification documents obtained by the Colombian National Police during the course of the investigation in their process of identifying the targets of the investigation and through surveillance photographs taken during the course of the investigation itself, often at BERNAL's office as the participants in many of the conversations described above were entering and exiting the office. The identifying information relating to the defendants was obtained from copies of the defendants' Colombian passport and Cedula applications. All of the identifying information was provided to the United States in response to the requests for judicial assistance in this case.

PAUL K. CRAINE
SPECIAL AGENT
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

Sworn and subscribed to before me this
___ day of November, 1999, at West Palm
Beach, Palm Beach County, Florida.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

60

# EXHIBIT A

## DEFENDANTS AGAINST WHOM EXTRADITION IS SOUGHT

ALEJANDRO BERNAL-MADRIGAL, a/k/a "Juvenal," a/k/a "Tony,"
Charged in counts 1,2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

FABIO OCHOA-VASQUEZ, a/k/a "Julio" a/k/a "Pepe,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

ALBERTO GALLEGO, a/k/a "El Doctor,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

MARTHA NUBIA RESTREPO ISAZA, a/k/a "Lucia,"
Charged in count 4 of the indictment; arrested in Colombia on October 13, 1999.

JAIRO de JESUS MESA-SANIN, a/k/a "PACO," a/k/a "Cristian," "Cunado,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

JAIME GONZALO CASTIBLANCO-CABALCANTE, a/k/a "Chalito," a/k/a "Sergio,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

RAMIRO VANOY-RAMIREZ, a/k/a "Cuco," a/k/a "Marcos,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

NELSON ALBERTO GIRALDO-PALACIO, a/k/a "Palustre," a/k/a "Albanil," a/k/a "Inginero
Luis Salgado,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

JAIRO SANCHEZ-CRISTANCHO, a/k/a "Jota,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

HERNAN ABELARDO GOMEZ-MORENO,
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

LUIS FERNANDO REBELLON-ARCILA, a/k/a "Jimmy,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

CARLOS JARAMILLO,
Charged in counts 2,3, and 4 of the indictment; fugitive.

HERMIS DE JESUS BETANCOURT-RIOS, a/k/a "Saulo,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

JORGE MAURICIO SANCHEZ-VIDAL, a/k/a "Mao,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

JOSE WALTER SEPULVEDA-RIOS, a/k/a "El Apa,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

ADRIANA MARCELA VACCA-BOJACA,
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

MAURICIO MEJIA TORO, a/k/a "Suchi," a/k/a "Motorola,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

FREDDY IVAN OCHOA-MEJIA, a/k/a "Andres,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

ALFREDO TASCON, a/k/a "Alfredito,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

JAVIER LINDO, a/k/a "El Gordo,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

DARIO ECHEVERRY,
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

EVER VILLAFANE-MARTINEZ, a/k/a "Juancho,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

MARIO ASTAIZA, a/k/a "Marciano,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

CARLOS CARDENAS, a/k/a "Caliche,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

BERNARDO ALBERTO SANCHEZ-NORENA, a/k/a "Don Bernardo,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

HECTOR MARIO LONDONO-VASQUEZ, a/k/a "El Negro,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

OSCAR ARTURO CAMPUZANO-ZAPATA, a/k/a "El Flaco,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

RICARDO PASTOR OCHOA-RUIZ, a/k/a "Camilo,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

EDWIN GONZALEZ-ARBELAEZ, a/k/a "Edwin Gonzalez," a/k/a "Juan Guillermo Arbelaez Diaz,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

SANTIAGO VELEZ VELAZQUEZ, a/k/a "Negro Velez,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

MARIO GERMAN LOPEZ CARDONA, a/k/a "Pedro,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

SERGIO PERDOMO LIEVANO,
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

JUAN GABRIEL USUGA NORENA, a/k/a "Bionico,"
Charged in count 4 of the indictment; Fugitive.

HORACIO DE JESUS MORENO URIBE,
Charged in count 4 of the indictment; arrested in Colombia on October 13, 1999.

CARLOS BARRERA, a/k/a "Caliche," a/k/a "Carlos David Barrera Garces,"
Charged in count  4 of the indictment; arrested in Colombia on October 13, 1999.

CARLOS MARIO LOPEZ MOLINA, a/k/a "Carlos Mario Londono Botero,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

OSCAR ALONSO GOMEZ MORENO,
Charged in count 4 of the indictment; arrested in Colombia on October 13, 1999.

FERNANDO ANTONIO ESQUIVIA SOTELO, a/k/a "Nando," "Cirilo,"
Charged in counts 2,3, and 4 of the indictment; fugitive.

LUIS CARLOS ZULUAGA QUICENO, a/k/a "Marco Antonio Arboleda Saldarriaga,"
Charged in counts 2,3, and 4 of the indictment; arrested in Colombia on October 13, 1999.

# EXHIBIT B

1

# *RAMIRO VANOY MURILLO*
## *(a. CUCO o MARCOS)*



## DATOS BIOGRAFICOS

| | | |
|---|---|---|
| CEDULA | : | 462653 DE YACOPI |
| ALIAS | : | CUCO<br>MARCOS |
| FECHA NACIMIENTO/DATE OF BIRTH | : | 31 MARZO DE 1948 |
| LUGAR NACIMIENTO/PLACE OF BIRTH | : | YACOPI C/MARCA |
| PADRES/PARENTS | : | ANIBAL Y MARIA DOLORES |
| ESTATURA/HEIGHT | : | 1.68 |
| | | |